### 21499

Joe D. KING, Respondent, v. Eston E. WILLIAMS, Jr., Appellant.
(279 S. E. (2d) 618)

*Burroughs, Green & Sasser,* Conway, *for appellant.*

*Stevens, Stevens & · Thomas, Loris,* and *Blatt, Fales, Bedingfield, Poole, Motley & Richardson,* Barnwell, *for respondent.*

June 22, 1981.

LITTLEJOHN, Justice:

Defendant Eston E. Williams, Jr., a general practitioner of medicine at Loris, South Carolina, appeals the jury verdict of $40,000 actual damages against him for his negligent diagnosis and treatment of plaintiff Joe D. King. We affirm.

In February, 1974, King suffered various scrapes, bruises and injuries after losing control of his vehicle and hitting several trees. The following day he entered Loris Commu-

nity Hospital where he was examined and treated by Dr. Williams.

Among other injuries, King suffered a painful and swollen left foot. Dr. Williams ordered X-rays of only the ankle region and personally observed and manipulated the foot. Based upon his reading of the X-rays, as well as the report of the radiologist, Dr. Williams diagnosed and treated the injury as a severe ankle sprain; he expected the pain and swelling to subside in about one month. King was released in early March and allowed to walk on the foot using a walking cast.

When the cast was removed in late March, the foot remained swollen and blue. Dr. Williams considered this condition to be normal and continued the same treatment. Over the next nine months, the foot did not heal; instead, King suffered ongoing agony, discomfort, and inconvenience from the extreme pain in his foot. Additional X-rays of the ankle region were ordered and read by Dr. Williams during this interval, but his evaluation and treatment remained unchanged. Continued pain medication was prescribed in addition to the use of an ace bandage and arch support.

In January, 1975, at the insistence of King and his wife, Dr. Williams referred King to orthopedic specialists in Myrtle Beach and Columbia. The specialists X-rayed the entire foot, including areas other than the ankle. Each diagnosed a fracture-dislocation of the foot, and corrective surgery was subsequently performed in June, 1975. King suffered a 30% disability.

At trial, Dr. Harry Rein of Orlando, Florida, testified on King's behalf, over objections, to the following:

1. That the injury to King's foot was a common one treated similarly by all physicians throughout the country;

2. That he was generally familiar with the standard of medical care in Loris, S. C.; and

3. That Dr. Williams failed to meet the standard of care in Loris or similar localities in his diagnosis and treatment of King's foot (*e.g.,* failure to order proper X-rays or diagnose the injury; failure to consult other physicians; failure to earlier refer the patient to a specialist).

On appeal, Dr. Williams challenges the admission into evidence of (1) the testimony of Dr. Rein, and (2) purported X-rays of King's foot, and contends that without this evidence there was insufficient competent evidence from which a jury could find any negligence on his part.

We first address the issue of whether Dr. Rein, a Florida physician, was qualified to pass judgment on the degree of skill exercised by Dr. Williams, a physician in Loris. By our previous decisions, a physician has been held to a degree of skill and learning which is ordinarily possessed and exercised by members of his profession in good standing in the same general neighborhood or in similar localities. *Bessinger v. DeLoach,* 230 S. C. 1, 94 S. E. (2d) 3 (1956). Accordingly, a medical expert has been required to initially establish his competency to testify by showing his familiarity with the degree of skill exercised in the locality of the defendant physician or similar localities. 70 C. J. S. *Physicians and Surgeons* § 62(d)(2). The rationale underlying this "locality" rule has been that the education, training, equipment, facilities, libraries, contacts, and opportunities for learning vary among regions, as, for example, between a country doctor and a city doctor. *Small v. Howard,* 128 Mass. 131, 35 Am. Rep. 363 (1880). However, this logic has gradually deteriorated with the advance of required higher education, wide dissemination of medical information, and increased access to updated medical facilities. See *Annot.* 37 A. L. R. (3d) 420 (1971), William L. Prosser, *Law of Torts* (4th ed. 1971) at § 32.

The "locality" rule has been critizized also for creating practical difficulties, including a scarcity of local physicians willing to testify on the plaintiffs' behalf, and permitting a

local standard of care below that which patients are entitled to expect. See 22 S. C. L. Rev. 810 (1970).

Recognizing the changed circumstances in the medical profession and the very real practical problems existing, courts in an ever-increasing number of jurisdictions have liberalized the "locality" restriction or removed it entirely. See *Shier v. Freedman,* 58 Wis. (2d) 166 (1973). Having reconsidered and examined the viability of the "locality" rule in South Carolina today, we hereby discard this rule and adopt a standard of care not bound by any geographical restrictions. More specifically, we agree with the standard set forth in *Pederson v. Dumouchel,* 72 Wash. (2d) 73, 431 P. (2d) 973 (1967), as follows:

"The 'locality rule' has *no* present-day vitality except that it may be considered as *one* of the elements to determine the degree of care and skill which is to be expected of the average practitioner of the class to which he belongs. The degree of care which must be observed is, of course, that of an average, competent practitioner acting in the same or similar circumstances. In other words, local practice within geographic proximity is one, but not the only factor to be considered. No longer is it proper to limit the definition of the standard of care which a medical doctor or dentist must meet solely to the practice or custom of a particular locality, a similar locality, or a geographic area."

Other factors meriting consideration include the type injury involved, as in *Rucker v. High Point Memorial Hospital, Inc.,* 285 N. C. 519, 206 S. E. (2d) 196 (1974), and the medical facilities available, as in *Brune v. Belinkoff,* 354 Mass. 102, 235 N. E. (2d) 793 (1968). The trial judge properly allowed Dr. Rein to testify.

Affirmance of the verdict is not dependent upon expert testimony. Even without Dr. Rein's testimony, the jury reasonably could have inferred that King's

injury was proximately caused by negligence of Dr. Williams. King suffered a foot injury. Dr. Williams X-rayed the ankle region only, and diagnosed a "severe sprain." While the initial examination and diagnosis was arguably not negligent, see 70 C. J. S. *Physicians and Surgeons* § 48(d), (e), the subsequent events clearly infer a failure to use proper skills. Dr. Williams expected general recovery of the foot in three weeks to one month; yet, despite persistent pain and swelling, he failed to X-ray areas of the foot other than the ankle for almost eight months. Furthermore, he failed to consult a specialist until almost one year later in spite of abnormal developments, *e. g.,* failure to timely heal, fallen arch and demineralization. While King did see a specialist in July, 1975 (about five months after the injury), Dr. Williams failed to consult the specialist either before or after the appointment. Dr. Williams admitted that King followed the prescribed medication. The law is well-established that expert testimony is not required where the common knowledge or experience of laymen is capable of inferring lack of proper care and also the required casual link. 70 C. J. S. *Physicians and Surgeons* § 62(d)(2); *Green v. Lilliewood,* 272 S. C. 186, 249 S. E. (2d) 910 (1978). We think the jury was justified under these circumstances in finding actionable negligence by Dr. Willams even absent the expert testimony.

Counsel for Dr. Williams objected strenuously at trial to the introduction of X-rays purportedly of King's foot on the ground that they were not properly authenticated. Authentication involves verification and identification by someone who has knowledge that the X-rays are what they purport to be, such as the technician taking them or the physician ordering them. 29 Am. Jur. (2d) *Evidence* § 800. In this instance, the technician who made the X-rays had moved away, and the physician who ordered them, Dr. Williams, was advised by his counsel to refuse to respond to any questions concerning authentication. The

X-rays, each inscribed with King's name, the date taken, and the name of Loris Community hospital, were admitted after the chain of possession was established. Additionally, Dr. Williams himself testified at one point that he had seen the X-rays "many times." We find no abuse of discretion in their admittance. Furthermore, we are aware of no authority which gives a witness in a civil trial the right to remain silent (as Dr. Williams was instructed by his counsel) absent the claim that the answer might subject the witness to *criminal responsibilty*.

The exceptions are without merit; the defendant received a fair trial and the judgment of the lower court is

Affirmed.

LEWIS, C. J., and NESS, GREGORY and HARWELL, JJ., concur.