**Sandra B. ANDREWS, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Kenneth ANDREWS, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. Nos. 80–0071–1, 80–0072–1.**

United States District Court, D. South Carolina, Charleston Division.

Sept. 30, 1982.

Nicolas Lempesis, Charleston, S. C., Ronald Hightower, Lexington, S. C., and Peter DeLuca, Goose Creek, S. C., for plaintiffs.

Heidi M. Solomon, Asst. U. S. Atty., Charleston, S. C., for defendant.

## ORDER

HAWKINS, District Judge.

These consolidated cases, heard by this court in April, 1982, present claims brought pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671, *et seq.*, and 10 U.S.C. § 1089. This action has been brought by the plaintiffs as one sounding in negligence on the part of agents of the United States arising out of medical treatment given to the plaintiff, Sandra B. Andrews, while she was being counselled and treated for depression from January to June, 1978, at the Naval Weapons Station Branch Clinic (hereinafter referred to as the "Clinic"), Charleston, South Carolina. The plaintiff, Sandra Andrews, has alleged that while undergoing general counselling, she was sexually abused by the physician's assistant rendering the counselling, Mr. Travis Gee. She further alleges that the defendant United States of America breached the applicable standard of medical care by failing to treat and to supervise her treatment in an accepted manner. The cause of action brought by her husband, Kenneth Andrews, arises out of and is dependent upon Mrs. Andrews' action, being one for emotional damage and loss of consortium, allegedly caused by the same incidents complained of by Sandra Andrews.

The United States has consistently taken the position that the alleged improprieties claimed by Mrs. Andrews did not occur, and that Mr. Gee was qualified to treat a patient such as Mrs. Andrews; that he did, in fact, render appropriate medical treatment to Mrs. Andrews, and that he was properly supervised by professional superiors at the Clinic.

The United States has further taken the position that even if this court found the allegations made by Mrs. Andrews concerning her treatment at the Clinic did occur, a cause of action for damages resulting therefrom would not lie against the United States. It contends that, even if Mr. Gee and his superiors were found to be within the scope of their federal employment, so that the Federal Tort Claims Act would apply, the United States has not extended such a limited waiver of sovereign immunity to those situations "arising out of assault and battery." 28 U.S.C. § 2680(h). Notwithstanding the fact that the plaintiffs' complaints sound in medical malpractice or negligent supervision, the defendant alleges that the acts that were the proximate cause of plaintiff's damages are based on assault and battery.

Upon the hearing of testimony, and after reviewing the exhibits and all the evidence presented, this court makes the following Findings of Fact and Conclusions of Law.

## I. FINDINGS OF FACT

1. Kenneth H. Andrews was the Chief Master at Arms aboard the U.S.S. PRATT, home quartered at the Naval Base, Charleston, South Carolina, during the period mid-1976 through June 1978. He and his family, including his wife, Sandra B. Andrews, were patients at the family practice group at the Naval Weapons Station Branch Clinic, Charleston, South Carolina, from mid-1976 through June 1978.

2. On January 12, 1978, Mrs. Andrews was treated at the Clinic by a physician's assistant, Warrant Officer Travis L. Gee (hereinafter "Gee"). While complaining of acute sinusitis during this visit, she appeared to be suffering from depression; and Gee recommended that she return to the Clinic as necessary in order to speak to someone about her depression.

3. At the time he was treating Mrs. Andrews, Gee's professional credentials included a Bachelor of Medical Science Degree from the University of Nebraska, in conjunction with the Physician's Assistant program sponsored by the Armed Forces. Gee received high commendations for acceptably completing all phases of his physician's assistant training program. He received national certification as a physician's assistant in 1976. General medical experience included his having been a Hospital Corpsman since his original Navy enlistment in 1960. Specific experience in psychiatry included his assignment for eighteen months on a psychiatric ward, as well as courses in psychology and counselling experience obtained during his training to become a physician's assistant.

4. The Physician's Assistant program is a program intended to enable a qualified physician's assistant to render medical care formerly rendered only by physicians. The purpose of the program is to extend the medical care given to Naval personnel and their dependents. The Bureau of Naval Personnel Manual describes the employment of the Navy Physician's Assistant as "certain tasks formerly undertaken only by physicians." The Navy's general guidelines given to the local Command for the utilization of a physician's assistant were set out in the Department of Medicine and Surgery Memo of July 15, 1974, identified as BUMED–316–rp. These guidelines, articulated with greater specificity by the local command and which were in effect at the Charleston Naval Regional Medical Center at all relevant times were those set out in the document identified as NRMCCHAS-NINST 1601.7A dated May 21, 1976. This document states:

The physician's assistant is a highly-skilled health care provider who is able to function in a wide variety of situations, but primarily in an ambulatory care setting. The physician's assistant is able to provide both acute and chronic care to all patients who do not require the full expertise of a physician.... The use of the physician's assistant in the military health care system is intended to augment and improve the quality of health care.... The Physician's Assistant is authorized prescription and order writing authority consonant with responsible physician supervision.

Thus, a physician's assistant is a provider of medical care, able to perform those medical duties usually performed by physicians, including the prescription of a drug such as Elavil, with specific duties assigned to him by his supervising physicians.

5. Gee was assigned to the Clinic from November of 1976 through all relevant times herein; that is, through June 1978. His medical supervisors, at a period prior to his commencement of the medical care of Mrs. Andrews, were the Officer in Charge of the Clinic, Dr. Bruce Junkin, as well as the other two doctors assigned there for the period from approximately November 1976 to December 1977, Dr. Joseph Schenck and Dr. Jerry Nowak. From the approximate period of Summer 1977 up to and including June of 1978, the Officer in Charge of the Clinic was Dr. David S. Frost, and the two other treating physicians assigned to that Clinic, who generally supervised Gee, were Dr. Michael Coates and Dr. Vince Ober.

6. Gee was authorized to provide general medical care under a doctor's supervision. He was a competent and capable physician's assistant whose credentials and abilities qualified him to treat a patient such as Mrs. Andrews, who appeared to be suffering from depression.

7. Under the general supervision of the physicians at the Clinic, Gee was qualified to prescribe an antidepressant such as Elavil, the most sedative of this type mood-elevator drug, and to counsel and monitor a patient such as Mrs. Andrews.

8. The business of the Clinic was to provide medical care to military personnel and their dependents. Sexual intimacies with a patient while undergoing medical treatment was not acceptable medical treatment.

9. The supervision of physician's assistants in general, and of Gee in particular, was left, by policy and practice, to those doctors who supervised him at the Clinic. During the period when Mrs. Andrews was being counselled by Gee, all medical charts of patients seen by Gee were reviewed daily by one of the doctors at the Clinic.

10. Dr. Coates and Dr. Frost reviewed Mrs. Andrews' medical records during her treatment at the Clinic and found the medical care there recorded to be appropriate and in accordance with recognized medical procedure.

11. Prior to Mrs. Andrews being seen at the Clinic in January 1978, her marriage had been undergoing a great deal of stress. On several occasions over a period of years prior to January 1978, her husband had physically assaulted her, several times in front of witnesses. These violent episodes occurred when Mr. Andrews abused alcohol, and his drinking problem had worsened in the months prior to her seeking counselling at the Clinic. Further stress was placed on the marriage due to problems Mr. Andrews was encountering in his employment.

12. When Mrs. Andrews came to the Clinic on January 17, 1978, she was not suicidal, but she was moderately depressed and anxious. She was having trouble sleeping, and her situation was assessed by Gee as chronic depression with multiple somatic complaints. He prescribed a tricyclic anti-depressant, Elavil, and noted in his record that he would discuss this treatment with Dr. Coates, the doctor to whom the Andrews family's care was assigned at the Clinic. Gee did discuss Mrs. Andrews' care with Dr. Coates and was authorized to continue treating her with Elavil and general counselling.

13. Mrs. Andrews had a consultation with Gee on January 23, 1978. She was seen by him again on January 31, 1978, at which time she reported to him that she had

confronted her husband on January 27th about his drinking problem. She appeared to Gee to be improving and was told to return to the Clinic in one week. She returned on February 7, 1978, and continued to improve. She was then told to return to the Clinic every two weeks. During her next consultation with Gee, on March 7, 1978, her medication was decreased. She had another consultation one week later, on March 15, 1978, and one on March 20, 1978, at which time the anti-depressive medication was discontinued due to her marked improvement.

14. Prior to his next consultation with Mrs. Andrews, Gee received a telephone call from a friend of Mrs. Andrews telling him that Mrs. Andrews was "in love" with him and planned to go on a trip with him to Las Vegas which Gee had been planning to take in order to attend a professional conference. The friend was concerned with Mrs. Andrews' mental status and feared she might be suicidal. Gee asked the friend to continue watching Mrs. Andrews for these suicidal tendencies and stated he would discuss these feelings with her at their next consultation.

15. Gee told Mrs. Andrews during her next visit to the Clinic on March 10, 1978, that he and his wife were going to Las Vegas and that while he was gone, if she needed medical attention, she should contact Dr. Coates.

16. When Gee returned from the convention, he saw Mrs. Andrews on April 13, 1978. He recorded in the medical records that she was "angry, hostile today—essentially uncommunicative when trying to encourage family counselling." She was told by Gee that she should schedule an appointment with her husband for joint counselling.

17. Mrs. Andrews returned to the Clinic without her husband on April 17, 1978, and reported to Gee that she had had a stressful weekend due to Mr. Andrews' alcohol abuse. Gee counselled her and told her to return to the Clinic only if necessary or with her husband.

18. At this point in Mrs. Andrews' counselling, Gee was not present at the Clinic for two to three weeks. He was hospitalized at the Naval Regional Medical Center from April 19–25, 1978, for surgery on his left knee.

19. While Gee was absent from the Clinic, Mrs. Andrews made no return visits for consultations with any other physicians or physician's assistants.

20. Mrs. Andrews returned to the Clinic on May 11, 1978. She was told to return to the Clinic with her husband, but on her next visit, May 25, 1978, Mr. Andrews did not accompany her. During the May 11th and May 25th visits, Mrs. Andrews reported to Gee, and the medical records so verify, that stress was increasing in the Andrews' marriage due to Mr. Andrews' alcohol abuse. She told Gee that her husband threatened her and threatened to hurt himself while abusing alcohol.

21. Medical records indicate that during a visit on June 14, 1978, Mrs. Andrews reported having headaches and some sleep disturbance. These records reveal her emotional turmoil. She was making plans to leave the area in order to be with her husband who was being transferred to Whiting Field, Florida. She was told to return to the Clinic when necessary, and she did return on June 27, 1978. This visit is recorded by Gee as her last visit before the transfer to Florida. Because she was feeling better, Gee recommended that she seek counselling only if necessary.

22. During the course of Mrs. Andrews' counselling and treatment by Gee, a complaint was made to Dr. Frost by one of his patients, Marie Lewis, regarding certain sexual intimacies which were taking place between Gee and Mrs. Andrews. This complaint was made in March or April of 1978, and Dr. Frost confronted Gee with these allegations, which were denied by Gee. Dr. Frost suggested that Gee further discuss these allegations with his preceptor, Dr. Coates, and assumed that this was done. Upon receiving Gee's denial, Dr. Frost did not pursue the matter any further.

23. Dr. Coates first became aware of allegations against Gee in June of 1979 and had no recollection of Gee ever discussing this matter with him prior to that date. Gee claims to have had no knowledge of the complaints and no recollection of speaking with Dr. Frost regarding the allegations until February 1979 when he gave a statement to the Naval Intelligence Service investigating the complaints.

24. Based on the testimony of Dr. Frost and Dr. Coates, I find that there were never any written instructions or regulations regarding the handling of a complaint and/or allegations made against a physician or a physician's assistant by a patient. This would be left up to the physician's best judgment. Dr. Frost, after confronting Gee with the allegations of sexual misconduct, never again discussed the matter with Gee, nor did he ever discuss the matter with Gee's preceptor, Dr. Coates. Dr. Coates testified that had a complaint been made to him, similar to that which was made to Dr. Frost by Mrs. Lewis regarding Mrs. Andrews' treatment, he would, at a minimum, confront the accuser, speak with the patient, speak with the physician or physician's assistant who was treating the patient, bring the matter to the attention of the preceptor and the head of the Clinic, and make a report to the head of Family Practice at the Naval Regional Medical Center and advise Naval Intelligence.

25. I find that during his counselling treatment of Mrs. Andrews from January 17 through June 27, 1978, Gee began making unwarranted and unprofessional sexual advances toward Mrs. Andrews. These advances included statements made to her that "she needed an affair," and that he was available to have an affair with her; that he told Mrs. Andrews that he desired her sexually and then, under the guise of treatment, began kissing and touching her; that he eventually attempted to remove her clothing on numerous occasions; that he exposed himself to her and attempted to encourage her to sexually relieve him, either manually or orally, and that he engaged in sexual intercourse with her in his office at the Clinic on her last visit there.

26. Based on the foregoing, I find that Mrs. Andrews' allegations concerning sexual advances, seduction and improper medical treatment did occur; that Mrs. Andrews was convinced by Gee that the best course of treatment for her was to engage in sexual intercourse with him; that she was truthful regarding the incidents of sexual intimacy and advances made by Gee, and I further find that Gee was not truthful when the matter was initially investigated by Naval authorities.

27. On October 5, 1978, the plaintiff was seen by Dr. Elton W. LeHew, a psychiatrist, who referred her to Ms. Sara Sterling for continuing therapy. At the time of her consultations with Dr. LeHew and Ms. Sterling, Mrs. Andrews was presented with chronic depression and confusion about her self worth. She was again treated with anti-depressant medications and was hospitalized briefly on April 16 and 17, 1979. She was diagnosed as suffering from a depressive neurosis with a borderline personality disorder. Ms. Sterling and another psychologist, Dr. Snyder, testified that although the episodes with Gee were not the sole cause of Mrs. Andrews' problems, these episodes were a contributing cause and continued to impair her psychological health. In addition to Gee's advances and sexual intercourse with Mrs. Andrews, his establishing a dependency relationship with her and the use of anti-depressant medication, namely Elavil, had greatly impaired Mrs. Andrews' ability to seek and maintain counselling which would be beneficial to her present emotional problems. I find that at the time of the trial Mrs. Andrews was being treated by a Ms. Cohen, a female therapist.

28. When plaintiff, Kenneth Andrews, in September 1978, confronted his wife as to why their marriage was not working, she blamed her emotional state and their marriage's failure on Gee. It was at this time when he learned of the relationship and the nature of the treatment his wife experienced with Gee, and he became severely depressed and began suffering from sleep disturbance, appetite loss, difficulty in maintaining his concentration and difficulty with his memory. He has had suicidal ideations and reported to Dr. Dudley Autio, a psychiatrist, on September 18, 1978. After talking with Mr. Andrews on that occasion, Dr. Autio felt that Mr. Andrews was in need of immediate hospitalization. He was diagnosed as suffering from acute severe situational depression. The marital relationship between Mr. and Mrs. Andrews has been irrevocably harmed and is permanent in nature. The emotional harm that Mr. Andrews has suffered is permanent in nature. And, although Mrs. Andrews' treatment at the hands of Gee was not the sole cause of Mr. Andrews' problems, it has been a significant contributing cause and continues to impair his psychological health.

29. I find that the damages suffered by both plaintiffs in all probability will be permanent in nature, or at best, would require long-term treatment.

30. I find that had proper supervision been formulated once the allegations of sexual intimacies and improprieties were made to Gee's supervisors, these matters would have been properly and promptly investigated and in all likelihood would have terminated the counselling relationship between Gee and Mrs. Andrews and would have averted the subsequent sexual intercourse and irreparable emotional harm being caused to both plaintiffs in this action.

## II. CONCLUSIONS OF LAW

It is well settled that the United States, as sovereign, is immune from suit except as it consents to be sued and that the terms of its consent to be sued in any court define the court's jurisdiction to entertain the action. *United States v. Sherwood,* 312 U.S. 584, 61 S.Ct. 767, 85 L.Ed. 1058 (1941). The United States has consented to be sued for torts pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671, *et seq.,* and 10 U.S.C. § 1089. Section 1089(a) of Title 10 reads in part:

The remedy against the United States provided by sections 1346(b) and 2672 of title 28 for damages for personal injury, including death, caused by the negligent

or wrongful act or omission of any physician, dentist, nurse, pharmacist, or paramedical or other supporting personnel (including medical and dental technicians, nursing assistants, and therapists) of the armed forces . . . in the performance of medical, dental, or related health care functions (including clinical studies and investigations) while acting within the scope of his duties or employment therein or therefor shall hereafter be exclusive of any other civil action or proceeding by reason of the same subject matter against such physician, dentist, nurse, pharmacist, or paramedical or other supporting personnel (or the estate of such person) whose act or omission gave rise to such action or proceeding.

■ This court is granted exclusive jurisdiction under 28 U.S.C. § 1346(b), which provides:

the district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

Thus, in addition to granting exclusive jurisdiction, the statute directs us to look at the law of the state where the act or omission occurred in order to determine whether a complaint in negligence warrants relief. *United States v. Muniz,* 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963); *Sanchez v. United States,* 506 F.2d 702 (10th Cir. 1974). In this case, South Carolina law provides the appropriate standards; therefore, this court must examine the substantive law of South Carolina with respect to medical malpractice and the law pertaining to *respondeat superior.*

■ As to medical malpractice, generally speaking,

[t]he burden of proof of negligence, proximate cause, and injury in a medical malpractice case is on the plaintiff throughout. In order to establish liability in a medical malpractice case, plaintiff must prove by a preponderance of the evidence the following:

(a) What the recognized and generally accepted standards, practices and procedures are in the community which would be exercised by competent physicians in the same specialty under similar circumstances.

(b) The physician or physicians and/or hospital personnel in question negligently deviated from the generally accepted standards, practices, and procedures.

(c) Such negligent deviation from the generally accepted standards, practices, and procedures was a proximate cause of the plaintiff's injury.

(d) The plaintiff was injured. *Steeves v. United States,* 294 F.Supp. 446 (D.S.C. 1968); *Price v. Neyland,* 320 F.2d 674 (D.C.Cir.1963).

*Ellis v. United States,* 484 F.Supp. 4, 10–11 (D.S.C.1978); *e.g., Green v. Lilliewood,* 272 S.C. 186, 249 S.E.2d 910 (1978); *Burke v. Pearson,* 259 S.C. 288, 191 S.E.2d 721 (1972); *Bessinger v. DeLoach,* 230 S.C. 1, 94 S.E.2d 3 (1956).

■ The Supreme Court in *King v. Williams,* 276 S.C. 478, 279 S.E.2d 618 (1981), stated in part:

The degree of care which must be observed is, of course, that of an average, competent practitioner acting in the same or similar circumstances. In other words, local practice within geographic proximity is one, but not the only factor to be considered. No longer is it proper to limit the definition of the standard of care which a medical doctor or dentist must meet solely to the practice or custom of a particular locality, a similar locality, or a geographic area.

*Id.* at 482, 279 S.E.2d at 620, quoting *Pederson v. Dumouchel,* 72 Wash.2d 73, 431 P.2d 973 (1967). "Other factors meriting consideration include the type of injury involved, as in *Rucker v. High Point Memorial Hospi-*

*tal, Inc.,* 285 N.C. 519, 206 S.E.2d 196 (1974), and the medical facilities available, as in *Brune v. Belinkoff,* 354 Mass. 102, 235 N.E.2d 793 (1963)." *King,* 276 S.C. at 482, 279 S.E.2d at 620.

In the context of Mrs. Andrews' allegations of negligent treatment and supervision, the question for the court is whether Mrs. Andrews' medical treatment conformed to the standard of care due her by the defendant.

In *Ellis v. United States,* 484 F.Supp. 4 (D.S.C.1978), it was held that "[f]or liability to attach . . . there must be a failure to comply with a recognized standard of medical care which would be exercised by similar physicians under the similar circumstances." *Steeves v. United States,* 294 F.Supp. 446, 453 (D.S.C.1968).

The defendant's agent, Gee, stood in the shoes of a physician while he was treating Mrs. Andrews, and, in addition, he was under the direct supervision of the physicians assigned to the Clinic. The treatment he rendered and the supervision the physicians rendered failed to comply with any recognized standard of medical care.

■ The defendant's failure to meet the standard of care was the proximate cause of the injuries suffered by the plaintiffs. The injuries caused the plaintiffs as a result of this negligence were a foreseeable result of the defendant's deviation from the generally accepted medical standards, practices, and procedures.

Having concluded that the treatment Mrs. Andrews received did not meet the required standard of care, this court must now consider the law of *respondeat superior.* In the case of *Edwards v. Rogers,* 120 F.Supp. 499 (D.S.C.1954), the district court held that the dividing line between employer's liability and immunity from liability for tort of his employee ordinarily lies in the right of the employer to control the acts of the agent or employee at the time the tort is committed. *Id.* at 503. It was further held, in *Porter v. United States,* 128 F.Supp. 590, (D.S.C.), aff'd, 228 F.2d 389 (4th Cir. 1955), that "before a master is responsible for torts of his servant, the servant must

not only be acting in course of his employment, or within scope of his authority, but must be actually engaged in his employer's business at the time of injury." *Id.* at 593.

In *Bradley v. Hullander,* 272 S.C. 6, 249 S.E.2d 486 (1978), the South Carolina Supreme Court held that "a master is liable for and is charged with knowledge of acts and conduct of his servants operating within the scope of their employment." *Id.* 249 S.E.2d at 500.

■ The defendant, through the physicians assigned to the Clinic, had the responsibility, duty and right to properly supervise their agent, Gee, when Mrs. Andrews presented herself for treatment at the Clinic. Dr. Frost was advised that there were improprieties between Gee and Mrs. Andrews, but he negligently failed to investigate the matter, thereby failing to properly supervise the medical treatment that was being given a patient for whom he was responsible.

The doctors assigned to the Clinic were qualified physicians and Gee was a qualified physician's assistant; therefore, their conduct is covered under the Federal Tort Claims Act. Dr. Frost, Dr. Coates and Gee were all acting within the scope of their employment, and the plaintiffs herein were injured by the negligent acts of these agents of the defendant. The exclusive remedy of the plaintiffs in this case, as set out in 10 U.S.C. § 1089, is against the United States. When the defendant undertook to provide medical care to Mrs. Andrews, it assumed the duty of providing her with medical treatment in accordance with acceptable medical standards, practices and procedures; and the conduct of its agents breached that duty.

The instant case is similar to *Loritts v. United States,* 489 F.Supp. 1030 (D.Mass. 1980), in which the plaintiff, an invitee on the West Point campus, was assaulted and raped by a West Point student, a government employee. It was the government's negligence that was the substance of the claim asserted. This case was decided upon the ground that West Point had assumed a

specific duty toward the plaintiff. She was a member of a choral group visiting on the West Point Campus, and West Point undertook the task of providing escorts to the group of which plaintiff was a member. *Loritts* was based upon the breach of the duty that West Point assumed to the plaintiff. In this case, as in *Loritts,* the defendant breached its duty to the plaintiffs.

■ Among its defenses, the defendant relies on 28 U.S.C. § 2680(h), which in essence excludes any claims arising out of assault and battery under the Federal Tort Claims Act. This defense, however, is without merit in that 10 U.S.C. § 1089(e) states:

> For purposes of this section, the provisions of section 2680(h) of title 28 shall not apply to any cause of action arising out of a negligent or wrongful act or omission in the performance of medical, dental, or related health care functions (including clinical studies and investigations).

The Federal Tort Claims Act provides that the United States shall be liable "in the same manner and to the same extent as a private individual under like circumstances. . . ." 28 U.S.C. § 2674 (1965). This clearly equates the United States to a private defendant with respect to the measurement, the elements and the amount of damages for which it may be found liable.

■ Claimants such as Sandra B. and Kenneth Andrews are entitled to be justly and reasonably compensated for the elements or items of loss, injury, or grievance to the extent recognized by law. South Carolina law recognizes and allows parties to recover for injuries related to claims for loss of consortium such as that filed by Mr. Andrews. *See Sossamon v. Nationwide Mutual Insurance Co.,* 243 S.C. 552, 135 S.E.2d 87 (1964).

Mental pain and suffering in connection with a wrong is a proper element of actual damages in South Carolina where it is a proximate consequence of a wrong. *See Ford v. Hutson,* 276 S.C. 157, 276 S.E.2d 776 (1981); *Lanford v. West Oakwood Cemetery Addition, Inc.,* 223 S.C. 350, 75 S.E.2d 865 (1953).

There is no question that the negligent treatment and supervision on the part of the defendant's agents proximately caused the mental pain, suffering and aggravation of pre-existing emotional problems experienced by Mr. and Mrs. Andrews.

■ Damages under the Federal Tort Claims Act are compensatory in nature, *see Massachusetts Bonding Company v. United States,* 352 U.S. 128, 77 S.Ct. 186, 1 L.Ed.2d 189 (1956); however, compensatory damages are not necessarily limited to pecuniary damages, but may include damages for loss of society and companionship. *D'Ambra v. United States,* 481 F.2d 14 (1st Cir. 1973), *cert. denied,* 414 U.S. 1075, 94 S.Ct. 592, 38 L.Ed.2d 482 (1973).

This court concludes that the plaintiffs have proven their cases as to liability and damages by a preponderance of the evidence.

This court has the authority to allow substantial sums for nonpecuniary damages, such as grief, past and present, and loss of companionship. *See Felder v. United States,* 543 F.2d 657, 676 (9th Cir. 1976); *United States v. Jacobs,* 308 F.2d 906, 907 (5th Cir. 1962).

It is apparent from the testimony that Mrs. Andrews has suffered a substantial loss as a result of the negligence of the defendant, and I find that an amount of Seventy Thousand and No/100ths ($70,-000.00) Dollars should be awarded to her.

It is apparent from the testimony that Mr. Andrews has suffered a substantial loss as a result of the injuries to his wife, and I find that an amount of Thirty Thousand and No/100ths ($30,000.00) Dollars should be awarded to him.

Based on the foregoing Findings of Fact and Conclusions of Law, it is hereby

ORDERED, that judgment be entered on behalf of the plaintiff Sandra B. Andrews in the amount of Seventy Thousand and No/100ths ($70,000.00) Dollars. It is

ORDERED FURTHER, that judgment be entered on behalf of the plaintiff Ken-

neth Andrews in the amount of Thirty Thousand and No/100ths ($30,000.00) Dollars.

AND IT IS SO ORDERED.