Sandra B. **ANDREWS** and Kenneth M. Andrews, Appellees,

v.

**UNITED STATES** of America, Appellant.

No. 82–2133.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 9, 1983.

Decided April 16, 1984.

Rehearing Denied July 10, 1984.

---

J. Weili Cheng, Dept. of Justice, Washington, D.C. (J. Paul McGrath, Asst. Atty. Gen., Washington, D.C., Henry Dargan McMaster, U.S. Atty., Columbia, S.C., Robert S. Greenspan, Dept. of Justice, Washington, D.C., on brief), for appellant.

Nicolas C. Lempesis, Charleston, S.C., for appellees.

Before WIDENER and ERVIN, Circuit Judges, and HOFFMAN *, District Judge.

* Honorable Walter E. Hoffman, United States District Judge for the Eastern District of Virginia, sitting by designation.

ERVIN, Circuit Judge:

The United States appeals from a judgment awarding damages to Sandra and Kenneth Andrews for mental distress caused by the medical malpractice of government employees. The government argues that the district court lacked jurisdiction under the Federal Tort Claims Act[1] to hear the Andrews' case. We are not persuaded by the government's arguments and, accordingly, affirm the decision in *Andrews v. United States*, 548 F.Supp. 603 (D.S.C.1982).

### I.

Kenneth Andrews was an officer aboard the U.S.S. PRATT, home quartered at the Naval Base, Charleston, South Carolina, from mid-1976 through June, 1978. During this two year period he and his wife, Sandra Andrews, were patients at the Naval Weapons Station Branch Clinic in Charleston. On January 12, 1978, Mrs. Andrews went to the clinic for treatment of acute sinusitus. She was treated by a physician's assistant, Warrant Officer Travis L. Gee. Gee noted that Mrs. Andrews appeared depressed and recommended that she return for counseling.

Gee had received national certification as a Physician's Assistant in 1976. His psychiatric training included counseling experience, psychology courses, and an 18-month assignment on a psychiatric ward. The Navy Physician's Assistant Guidelines permitted Gee to perform medical duties usually carried out by physicians such as the prescription of drugs. From the summer of 1977 through June of 1978, Gee was supervised by the officer in charge of the clinic, Dr. David S. Frost, and by two other treating physicians assigned to the clinic, Dr. Michael Coates and Dr. Vince Ober.

When Mrs. Andrews returned to the clinic on January 17, 1978, Gee diagnosed her as having chronic depression with multiple somatic complaints, and he prescribed an anti-depressant, Elavil. Gee, however,

---

1. 28 U.S.C. §§ 1346(b), 2671–2680.

soon exceeded the bounds of the Hippocratic oath.[2] Between January 17 through June 17, 1978, Gee made sexual advances toward Mrs. Andrews during counseling sessions. Specifically, he told his patient that "she needed an affair" and that he was available to have an affair with her. The district court found that "under the guise of treatment," Gee began touching and kissing Mrs. Andrews and tried to remove her clothes on several occasions. Towards the end of this period of treatment, Gee finally succeeded in engaging Mrs. Andrews in sexual intercourse. The district court specifically found "that Mrs. Andrews was convinced by Gee that the best course of treatment for her was to engage in sexual intercourse with him." 548 F.Supp. at 609.

In March or April of 1978, Dr. Frost received a complaint about Gee from one of his patients, Marie Lewis. Lewis informed Dr. Frost that Gee had engaged in sexual improprieties with Mrs. Andrews. Dr. Frost confronted Gee with these allegations, but when Gee denied them, Frost pursued the matter no further. Gee's other immediate supervisor, Dr. Coates, did not learn of the allegations against Gee until a year later. Coates testified that had a complaint been made to him, he would have confronted the accuser, spoken with the patient, and spoken with the physician's assistant. The district court specifically found that:

> ... had proper supervision been formulated once the allegations of sexual intimacies and improprieties were made to Gee's supervisors, these matters would have been properly and promptly investigated and in all likelihood would have terminated the counselling relationship between Gee and Mrs. Andrews and would have averted the subsequent sexual intercourse and irreparable emotional

harm being caused to both plaintiffs in this action.

548 F.Supp. at 609.

Following Gee's abusive course of therapy, Mrs. Andrews suffered severe depression and confusion about self-worth. She revealed Gee's conduct to her husband and blamed it for the break-up of their marriage. This in turn caused her husband severe depression. After a bench trial, the district court awarded Sandra and Kenneth Andrews damages in the amount of $70,000 and $30,000 respectively. On appeal, the government argues that the district court erred in its findings of fact and in its legal conclusions. Specifically, the government argues that Gee's promises of therapy were not the inducement for Mrs. Andrews' sexual encounters with him. Consequently, it contends first that this suit arose from conduct outside the scope of government employment and therefore is not actionable under the Federal Tort Claims Act, and second that it arose from an assault and battery for which sovereign immunity has not been waived.

## II.

■ The United States contests only one specific finding of fact—"that Mrs. Andrews was convinced by Gee that the best course of treatment for her was to engage in sexual intercourse with him." Under Fed.R.Civ.P. 52(a), "[f]indings of fact shall not be set aside unless clearly erroneous...." The Supreme Court instructs that "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). We conclude that testimony at trial supports the district court's finding, and our review of the entire record

---

2. The Hippocratic oath states, "In every house where I come, I will enter only for the good of my patients, keeping myself far from all intentional ill-doing and all seduction, and especially from the pleasures of love with women and men." Steadman's Medical Dictionary, 579 (22d

ed. 1972). Although not a basis for liability in this case, the Hippocratic oath is indicative of the medical profession's historic knowledge of and concern about the potential for sexual abuse of the physician-patient relationship.

leaves us without the "firm conviction that a mistake has been committed."

Mrs. Andrews testified that she was afraid to tell anyone about Gee's sexual advances because Gee had said he could not continue therapy if she did. Mrs. Andrews' only confidant, Joyce Thompson, testified about Mrs. Andrews' confused dependency on Gee at this time.[3] After learning of Gee's unwarranted advances, Thompson advised Mrs. Andrews not to continue seeing him. Mrs. Andrews, who appeared "very confused" to Thompson, told Thompson that she believed in what Gee was doing and that she felt he was helping her. Mrs. Andrews experienced ambivalence about continuing treatment but she always returned because of her belief that Gee was helping her.

Mrs. Andrews' testimony concerning her final assignation with Gee also supports the district court's conclusion that Gee had succeeded in using the guise of therapy to engage a confused and dependent patient in sexual intercourse.[4] Nothing in Mrs. Andrews' testimony indicates that she did not consent to have intercourse with Gee. Rather, her testimony indicates that she felt a need for and sought Gee's counseling; that Gee used his position to create a situation in which she was vulnerable to his advances; and that Gee preyed on her vulnerability by engaging her in sex. The

3. Mrs. Andrews confided in Joyce Thompson that Gee, whom Mrs. Andrews referred to as "Dr." Gee, had made sexual advances. Thompson recounted her conversation with Mrs. Andrews concerning subsequent visits to Gee:

Q. Did she talk to you after her next visit?
A. Yes, and each day before.
Q. What did she say?
A. She said she didn't know whether she should go back or not, that she didn't understand his therapy.
Q. Did you give her any advice?
A. Yes, I did. I told her that I wish she would see someone else.
Q. What was her response?
A. She felt that he was helping her. She stated that he had advised her that if she were—I don't know how to put this—he told her according to Mrs. Andrews that—I don't know how else to say it, I am going to put it in my own words—that if she told anybody about this therapy, that he wouldn't be able to help her, and she wanted help.
Q. [by Mr. Lempesis] When you advised Mrs. Andrews about seeking other counsel or seeing someone else, what was her response?
A. She had developed a rapport with her doctor. She felt that he was helping her.
Q. Did she tell you this?
A. Oh, yes. We went back and forth about this all the time. She felt he was helping her a lot. She believed in what he was doing.
Q. Did she appear to you at this time to be confused, dependent upon him?
A. She was very confused.

4. Mrs. Andrews traveled from Florida to Charleston for her final meeting with Gee.

Q. [by Mr. Lempesis] How did you get back to Charleston from Florida in August?
A. I drove.
Q. Did you still feel or did you feel any dependency on Mr. Gee because of the treatment he had given you?
A. What do you mean by the dependency part? Did I think that he would help me?
Q. Yes.
A. Yes.
Q. So you drove all the way from Florida to Charleston to talk to him?
A. Yes.
Q. Did you, in fact, contact Mr. Gee?
A. Yes, I did.
Q. How did you contact him?
A. by 'phone, and I went to the main hospital where he had—he was on duty.
Q. Do you recall what day this was?
A. It was around the first part of August, I believe August 4th. I don't know.
Q. Did you talk to Mr. Gee?
A. Yes, I did.
Q. Do you recall that conversation at this time?
A. No, I don't.
Q. As a result of that conversation, what did you do next?
A. He suggested that we go to a motel and talk.

. . . . .

Q. [by Mr. Lempesis] What transpired once you-all went into the motel room?
A. We talked about how my marriage was doing, was my husband drinking? And I had told him, no, he had promised if I had went to Florida, that he would quit drinking to which he had at that point quit drinking, and—
Q. Was this the same type of conversation—I'm sorry, I didn't mean to interrupt you. Go ahead.
A. —and we had sexual intercourse.
Q. Prior to the sexual intercourse, was the conversation you had similar in nature to the ones you had had while you were being counseled by Mr. Gee at MenRiv?
A. Yes, sir. He was helping me.

evidence taken as a whole strongly indicates that Mrs. Andrews believed sexual relations were necessary to continue her treatment. We conclude that it was not unreasonable for the district court to infer from this evidence that in Mrs. Andrews' confused state of mind, she believed that sexual relations were part of the "therapy" itself.

### III.

The Federal Tort Claims Act waives sovereign immunity by allowing the United States to be sued for money damages arising from personal injury

> ... caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b).

The district court found that "Dr. Frost, Dr. Coates and Gee were all acting within the scope of their employment, and the plaintiffs herein were injured by the negligent acts of these agents of the defendant." 548 F.Supp. at 611. It is clear that Dr. Frost was acting within the scope of his employment at the time he negligently failed to exercise a reasonable degree of supervision. We do not agree, however, that Gee acted within the scope of government employment when he manipulated the physician-patient relationship to seduce Mrs. Andrews.

■ In South Carolina,

> before a master is responsible for torts of his servant, the servant must not only be acting in the course of his employment, or within the scope of his authori-

ty, but must be actually engaged in his employer's business at the time of injury. *Porter v. United States*, 128 F.Supp. 590, 595 (D.S.C.), *aff'd*, 228 F.2d 389 (4th Cir. 1955) (interpreting South Carolina law). Nothing in the record suggests that Gee considered his sexual adventures to be a *bona fide* part of the therapy he was employed to provide. On the contrary, the government took the position at trial that Gee never had sexual relations with Mrs. Andrews.[5] Thus, it is clear that Gee was furthering his self-interest, not his employer's business, at the time he seduced his patient. *Cf. Rabon v. Guardsmark, Inc.*, 571 F.2d 1277 (4th Cir.) *cert. denied*, 439 U.S. 866, 99 S.Ct. 191, 58 L.Ed.2d 176 (1978) (sexual assault by security guard while at work not within scope of guard's employment).

■ The fact that Gee was not acting within the scope of his employment during the time he inflicted emotional injuries on Mrs. Andrews, however, does not bar recovery. This is because the gravamen of the Andrews' claim is based on the supervising physicians' failure to exercise due care in discharging their duty to provide Mrs. Andrews with adequate medical care. *Cf. Rogers v. United States*, 397 F.2d 12, 14 (4th Cir.1968) ("When an agency of the United States voluntarily undertakes a task, it can be held to have accepted the duty of performing that task with due care."); *Loritts v. United States*, 489 F.Supp. 1030 (D.Mass.1980) (failure of West Point to fulfill the duty it assumed of escorting female visitors gave rise to liability for cadet's sexual assault of an unescorted visitor). Because Dr. Frost was clearly acting within the scope of his employment at the time he negligently failed to provide adequate supervision, the district court properly exercised jurisdiction over the Andrews' complaint under 28 U.S.C. § 1346(b).[6]

---

**5.** On appeal, the government does not contest the district court's finding of fact to the contrary.

**6.** The Andrews' only remedy for the damage caused by Dr. Frost's negligence is against the United States. 10 U.S.C. § 1089(a) provides

that, "The remedy against the United States provided by sections 1346(b) and 2672 of title 28 for damages for personal injury ... caused by the negligent or wrongful act or omission of any physician ... of the armed forces ... while acting within the scope of his duties or employ-

## IV.

The government further argues that this suit arose from an assault and battery, and therefore the provisions of § 1346(b) are made inapplicable by 28 U.S.C. § 2680(h). Section 2680(h) provides exceptions to the Federal Tort Claims Act's waiver of sovereign immunity for "any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit or interference with contract rights." The government contends that under *Hughes v. United States*, 662 F.2d 219 (4th Cir.1981), the Andrews' cause of action for negligent supervision is barred by this section. In *Hughes* we held that § 2680(h) barred the parents of two children who had been assaulted by a postal worker from suing the United States for the negligent supervision of the postman. We found that the Hughes' claims, although framed in negligence, actually arose out of the assaults and batteries committed by the postal worker, a government employee.

 *Hughes*, however, is inapposite because the Andrews' claim did not arise out of an assault and battery. In South Carolina the tort of assault arises "if reasonable fear of bodily harm has been caused by the conduct of the defendant." *Herring v. Lawrence Warehouse Co.*, 222 S.C. 226, 72 S.E.2d 453, 458 (1952). Battery is defined as "the actual infliction of any unlawful, unauthorized violence on the person of another, regardless of its degree ...." *Id.* No evidence supports the government's contention that Gee assaulted Mrs. Andrews. Although some evidence supports the conclusion that Gee's initial physical contacts were unauthorized and offensive, those contacts were not the damaging acts. As the district court found, it was the sexual intercourse that occurred after Dr. Frost was alerted to Gee's improper advances that caused "irreparable emotional harm ... to both plain-

tiffs in this case." We have accepted the district court's finding that Mrs. Andrews consented to engage in sex with Gee because she was induced to believe that it was the best course of treatment for her. Hence, the Andrews claim did not arise out of an assault or battery.

A review of recent cases addressing similar situations in which a medical professional seduced a patient under the guise of therapy supports this conclusion. In those cases, the resulting cause of action is described as medical malpractice. *E.g. Vigilant Insurance Company v. Kambly*, 114 Mich.App. 683, 319 N.W.2d 382 (1982) (seduction of patient by psychiatrist under guise of treatment considered malpractice for which insurer might be held liable); *Aetna Life and Casualty Co. v. McCabe*, 556 F.Supp. 1342 (E.D.Pa.1983) (drug treatment and sexual involvement with patient treated as medical malpractice for which insurer is liable). Distinguishing this particularly reprehensible genre of malpractice from an action based on seduction, the New York Supreme Court accurately noted that "the injury to the plaintiff was not merely caused by the consummation of acts of sexual intercourse with the defendant. Harm was also caused by the defendant's failure to treat the patient with professionally acceptable procedures." *Roy v. Hartogs*, 85 Misc.2d 891, 381 N.Y.S.2d 587, 588 (1976).

We conclude that Gee's actions amounted to medical malpractice, not assault and battery, and, therefore, § 2680(h) does not bar the Andrews from recovering damages under the Federal Tort Claims Act for the negligent supervision provided by Dr. Frost.[7]

## V.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

---

ment therein or therefor shall hereafter be exclusive of any other civil action ...."

**7.** The district court found that Dr. Frost's failure to formulate proper supervision after he was

informed of Gee's improper conduct was a proximate cause of the Andrews emotional damages. *See* 548 F.Supp. at 609 and 612.