**Tamara Jo THIGPEN, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Joann Evelyn KRAMBER, as Guardian ad Litem for Lisa Marie Kramber, a minor under the age of eighteen (18) years, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. Nos. 2:85–0459–1, 2:85–0460–1.**

United States District Court,
D. South Carolina,
Charleston Division.

Sept. 12, 1985.

Joel D. Bailey and H. Fred Kuhn, Beaufort, S.C., for plaintiffs.

Glen E. Craig, Asst. U.S. Atty., Columbia, S.C., and Heidi Solomon, Asst. U.S. Atty., Charleston, S.C., for defendant.

## AMENDED ORDER

HAWKINS, District Judge.

These sexual abuse cases arise under the Federal Tort Claims Act. 28 U.S.C. § 2671. The defendant moves to dismiss both cases for lack of jurisdiction over the subject matter. Rule 12(b)(1), Fed.R.Civ.P.[1] It argues, *inter alia*, that the plaintiffs' claims are barred by the intentional tort exception to the Act, 28 U.S.C. § 2680(h), and that the government's employee, Edmundo Rodriguez, was acting outside of the scope of his employment when he sexually assaulted the girls. This court agrees with the defendant. For reasons to be stated, it is the opinion of this court that the defendant's motion to dismiss should be granted.

### A. FACTS AND PROCEDURAL HISTORY

Lisa Marie Kramber (hereinafter "Kramber")[2] is the daughter of Gary Kramber, United States Marine Corps (Ret.). On March 15, 1981, she was admitted as a twelve-year-old patient to the United States Naval Hospital in Beaufort, South Carolina, suffering from a ruptured appendix. She was entitled to receive medical care from the defendant because she is her father's dependent.

Tamara Jo Thigpen (hereinafter "Thigpen") was fourteen years old in early 1981. On March 17 of that year she, like Kramber, was admitted to the Naval Hospital in Beaufort for treatment of a ruptured appendix. Thigpen was entitled to receive medical care from the United States because she is a dependent of her father, Pascal Gene Thigpen, United States Marine Corps (Ret.).

Following the removal of her appendix, Kramber was taken to the hospital's Intensive Care Unit. There she was treated by Corpsman Edmundo Rodriguez, who checked her vital signs and monitored her recovery from the anesthesia.

From the Intensive Care Unit, Kramber was transferred to a room on the fourth floor of the hospital. On the afternoon of March 17, 1981, with her mother present, Rodriguez came into her room to check on her progress. During the early morning hours of March 18, 1981, Rodriguez returned to Kramber's room and stated that he needed to check her vital signs. She noticed that he did not have a blood pressure cuff. Rodriguez extended Kramber's arms and twice attempted to force her to touch his groin area. He told her to open and close her hand because this was the "Spanish way" of determining blood pressure. She refused and grabbed the handrail on her bed.

After this unsuccessful attempt, Rodriguez asked to see Kramber's incision. He lifted up her gown and then pulled down her underpants. Rodriguez fondled her genitals; Kramber became frightened, pulled up her underpants, and told him to stop. Rodriguez left the room.

Thigpen's case is similar. Following her appendix surgery on March 18, she was taken to the hospital's Intensive Care Unit. While recovering from the anesthesia, she was attended by Rodriguez. From the Intensive Care Unit, Thigpen was transferred to Kramber's room. During the early morning hours of March 19, Rodriguez came into the girls' room. First, he approached Thigpen, who was asleep. She awoke and found Rodriguez examining the intravenous needle in her arm. He asked her if it was bothering her. She said that it was and asked that a cool rag be placed on her forehead.

---

1. For the purposes of this motion, the "Court must accept as true all material facts alleged in the complaint." *Asociacian De Reclamantes v. The United Mexican States*, 561 F.Supp. 1190, 1192, (D.D.C.1983).

2. Because Kramber is still a minor, her mother, JoAnn Evelyn Kramber brings this suit on her behalf.

Rodriguez went around to the other side of the bed and picked up her other arm. He forced her hand to his genital area and instructed her to open and close her hand so that he could take her blood pressure the "Spanish way." She opened her hand, realized what he was doing, pulled her hand away, and reached for the cool cloth. Rodriguez placed it on her head and told her to "cool down."

Leaving Thigpen, he went to Kramber's bed. Kramber, who had seen him enter the room and accost her roommate, and who overheard part of Thigpen's and Rodriguez's conversation, realized that he would probably repeat his action of the previous night. True to form, he tried to force her hand to his groin, all the while telling her to open and close her hand. She refused and grabbed the bed handrail. Another corpsman looked into the room and interrupted Rodriguez's attack. The unknown corpsman closed the door. Rodriguez was about to leave when the door opened and a third corpsman came in with a thermometer box and blood pressure cuff. As he entered, Rodriguez left the room and said he would be back in twenty minutes. He did not, however, return.

The following morning the girls discussed the incident between themselves. Mrs. Kramber visited her daughter. When she took her into the bathroom to help her change clothes, Kramber started crying and told her mother about the corpsman's attack. Mrs. Kramber became very upset, confronted her daughter's treating physician, Dr. Pearce, and told him she wanted her daughter out of the hospital. Pearce's initial response was that Kramber probably suffered a reaction to her medication. Mrs. Kramber pressed him with the matter. After conferring with another doctor, Pearce removed Kramber's stitches and discharged her from the hospital.

At home, Kramber developed a high fever. After receiving assurances that Rodriguez had been restricted to quarters, Mrs. Kramber readmitted her daughter to the hospital where she again shared a room with Thigpen.

Upon her daughter's discharge and recovery from surgery, Mrs. Kramber contacted Beaufort County law enforcement authorities. Rodriguez was brought to trial on October 21, 1981. He was convicted in the Beaufort County Court of General Sessions of two counts of committing a lewd act upon a 12-year-old child and one count of contributing to the delinquency of a 14-year-old child. *State v. Rodriguez*, 279 S.C. 106, 302 S.E.2d 666 (1983). Rodriguez was sentenced to nine years on the two counts and three years on the other count. In addition, it was revealed at the trial that Rodriguez, prior to enlisting in the Navy, pled guilty in 1980 in a State of Texas court to indecency with a child. He committed this crime on October 16, 1979, when he touched the genitals and breasts of a 10-year-old child and forced her to touch his genitals. He was sentenced to an indefinite period of probation, thirty days of incarceration, and ordered to submit to psychiatric counselling. The plaintiffs contend that, despite this sentence, an agreement was reached among Rodriguez, his attorney, his probation officer, Navy enlistment personnel, and the sentencing judge which allowed Rodriguez to enlist in the Navy instead of serving his sentence.

On February 15, 1985, Kramber and Thigpen each filed suits in this court. They assert five theories of recovery against the defendant:

(1) Negligence of the plaintiffs' treating physicians in failing to obtain their informed consent;

(2) Breach of recognized standards of medical care by hospital staff in allowing a child molester to participate in the treatment and care of a child;

(3) Breach of supervisory Naval personnel of their duty to recruit, assign and retain, qualified, suitable medical personnel;

(4) Negligent supervision and control by the hospital staff; and,

(5) Negligence of the hospital staff for failing to provide adequate security on the defendant's premises.

On May 20, 1985, the defendant filed its motion to dismiss in the Thigpen case. The Government filed an identical motion to dismiss in Kramber's case on June 2, 1985. On June 17, 1985, plaintiff Thigpen submitted a memorandum opposing the motion to dismiss. On June 19, 1985, the court heard oral argument on the motions. At this hearing, the parties stipulated that all motions and arguments made in the Thigpen case would be fully applicable to the Kramber case because the facts in each are nearly identical. At the hearing, the court took the defendant's motions under advisement and permitted the parties to file supplemental memoranda in support of their positions. Since the date of the hearing, memoranda, letters and affidavits were received by the court from plaintiffs and defendant.

## B. THE DEFENDANT'S MOTION TO DISMISS

The defendant asserts three grounds in support of its motion to dismiss. First, it argues that this court lacks jurisdiction because the plaintiffs' administrative claims failed to apprise it of its potential liability for medical malpractice. *Adams v. United States,* 615 F.2d 284, 289 (5th Cir.1980).

Second, it contends that plaintiffs' claims are barred by the assault/battery exception of 28 U.S.C. § 2680(h) because Rodriguez's conduct inflicted unauthorized, unlawful violence and created reasonable fear of bodily harm. *Mary Doe v. United States,* 769 F.2d 174 (4th Cir.1985); *Hughes v. United States,* 662 F.2d 219 (4th Cir.1981); *Turner v. United States,* 595 F.Supp. 708 (W.D.La. 1984); *Taylor v. United States,* 513 F.Supp. 647 (D.S.C.1981). *Contra, Andrews v. United States,* 732 F.2d 366 (4th Cir.1984).

Finally, the defendant asserts that the plaintiffs' claims are barred by the "scope of employment" requirement under 28 U.S.C. § 1346(b) because Rodriguez's actions had nothing to do with his duties as a hospital corpsman. Without passing on the defendant's argument regarding plaintiffs' administrative claims, the court finds the other two arguments compelling. Therefore, it grants the motion to dismiss on the following two grounds.

### 1. *The Assault and Battery Exception*

■ Title 28, United States Code Section 2680(h), provides in pertinent part:

The provisions of this chapter and § 1346(b) of this title shall not apply to

. . .

(h) Any claim *arising out* of assault, battery, false imprisonment, false arrest, malicious prosecution, [and] abuse of process ... 28 U.S.C. § 2680(h) (emphasis added).

In South Carolina, the tort of assault arises if "reasonable fear of bodily harm has been caused by the conduct of the defendant." *Herring v. Lawrence Warehouse Co.,* 222 S.C. 226, 72 S.E.2d 453, 458 (1952). Battery is defined as "the actual infliction of any unlawful, unauthorized violence on the person of another, irrespective of its degree. . . ." *Id.* The evidence is overwhelming that Rodriguez's conduct was an assault and a battery on both children.

Kramber's testimony at Rodriguez's trial supports the conclusion that her assailant's conduct created a "reasonable fear of bodily harm" and that it was unlawful, unauthorized violence on her person. She described the first incident, which occurred in the early morning hours on March 18, 1981, in this way:

A. ... he asked to see my incision and so I pulled up my nightgown just a little bit above my incision and then—and then he was looking at it and then he pulled down my underpants and he had his fingers on my private parts and he was moving them around and he asked me the question if the nurse gave me—but I don't remember the word he used, it was some medical term *and I said yes, even though I didn't know because I was scared he was going to do something and then I pulled up my underpants and I told him, I said, don't do that.* [Tr. 37–38] (emphasis added).

\*     \*     \*     \*     \*     \*

(Rodriguez) held my arm ... between his legs and his private parts (witness crying) ... and he was pushing my arm up and told me to open and close my hand and *I wouldn't do it so I grabbed the side of the bed on the bar and he was trying to pull my hand off and I wouldn't let him* ... [Tr. 35] (emphasis added).

Q. And you say that he made you put his—your hand down into his private parts?

A. Yes.

    \*    \*    \*    \*    \*    \*

Q. And did he make you touch him?

A. He was trying to but *I wouldn't let him, I was holding onto the bar of the bed.* [Tr. 37] (emphasis added).

She testified about the second incident, which occurred early on March 19, 1981:

A. ... he came over to my right side again and he took my hand and he had his right hand above my elbow, the midsection of my arm, and *he was pushing* my arm up and with his other hand *he was holding down on my wrist and making my hand go up by his private parts* between his legs and he was telling me to open and close my hand and I told him I couldn't and he said, yes, you can. And *I grabbed the bar of the bed again* ...

Q. Okay. Now, when he was trying to get your hands near his private parts, *did you resist him? Did you try to keep him from doing that?*

A. *Yes.*

Q. And did you ever—did he ever make you touch his private parts?

A. He tried to *but I wouldn't let him, I was holding onto the bar and I wouldn't let go.*

Q. Tell the jury whether or not—did these actions of Rodriguez upset you?

A. Yes, they did ...

Q. *Were you upset from the beginning until you left the hospital?*

A. *Yes, when I realized what he was doing.* [Tr. 41–43] (emphasis added).

Furthermore, Kramber's affidavits are consistent with her trial testimony as set out above. In her affidavit dated July 12, 1985,[3] she describes her fear:

In addition to checking my vital signs and looking at my incision, Corpsman Rodriguez touched my genital area and *I became apprehensive.* [Aff. p. 2, ¶ 6] (emphasis added).

When he began to examine me during the second visit, however, *I refused to cooperate with him* because I felt he was not acting properly, and *I was afraid* to let him examine me as he had the night before. [*Id.,* p. 4 ¶ 10] (emphasis added).

Mrs. Kramber's affidavit also describes her daughter's fear:

[M]y daughter asked me not to say anything because *she was afraid.* [Aff. p. 3, ¶ 11] (emphasis added).

Thigpen's testimony also leaves no doubt that Rodriguez's conduct was an assault and a battery. She testified:

Okay, I was sleeping when Mr. Rodriguez came in, I didn't know he was in there and then he took my right arm which had an IV in it and I woke up and he was just looking at my IV and everything and I asked him what he was doing and he said oh, I'm just checking it, and I didn't pay any attention to it. And then he asked me if it was bothering me and it was bothering me then so I asked him to give me my rag and he said okay, and so he went around to the bed and he picked my arm up off the bed and was feeling my arm, and then he started moving it toward him, I mean, like forcing me until I forced his private parts and he told me to open and close my hand. I opened it and I just kinda realized what he was doing and then I pulled away and then I was getting real hot because I had a temperature that day and I went to grab for my rag and he just put it on my head and told me to cool down. [Tr. 56, 57].

---

**3.** This affidavit does not materially differ from the affidavit dated March 24, 1981.

Rodriguez did not do anything else to Thigpen because "I was—I mean, I was *real scared* and he just told me to cool down." [Tr. 57] (emphasis added). She could not tell what Rodriguez did with respect to her roommate "because I was kinda *scared*." [Tr. 58] (emphasis added). Thigpen "didn't really want to tell anybody about it, you know, I was *scared....*" [Tr. 59] (emphasis added).

By plaintiffs' own admissions, Rodriguez's conduct *scared them*, thereby creating a reasonable fear of bodily harm. Moreover, his actions were clearly unlawful, unauthorized violence on each girl's body.

■ The plaintiffs attempt to avoid this bar by arguing that their theories of recovery are expressly based upon the alleged negligence of Naval personnel who were acting within the scope of their employment. The gravamen of their complaints is that the Navy acted negligently by permitting Rodriguez, a known child molester, to enlist and then placing him in a position, without adequate supervision, where he would have contact with children.

In the recent case of *United States v. Shearer,* — U.S. —, 105 S.Ct. 3039, 87 L.Ed.2d 38 (1985), the Supreme Court entertained an argument similar to plaintiffs'. A Private Shearer was off duty at Fort Bliss and away from the base when he was kidnaped and murdered by another serviceman, Private Andrew Heard. A New Mexico court convicted Private Heard of Shearer's murder and sentenced him to a term of 15 to 55 years of imprisonment.

Shearer's mother brought suit under the Federal Tort Claims Act, claiming the Army's negligence caused her son's death. She alleged that Heard, while assigned to an Army base in Germany in 1977, was convicted by a German court of manslaughter and sentenced to a 4-year prison term. Upon his discharge from that confinement in Germany, the Army transferred Private Heard to Fort Bliss. Shearer's mother further alleged that, although the Army knew

he was dangerous, it negligently and carelessly failed to exert a reasonably sufficient control over him and failed to warn other persons that he was at large. The District Court granted summary judgment in favor of the United States, but the Court of Appeals reversed.

The Supreme Court reversed the Circuit Court on the basis of the *Feres* doctrine.[4] In discussing the assault/battery exception, Chief Justice Burger, joined by Justices White, Rehnquist and O'Connor, said:

No semantical recasting of events can alter the fact that the battery was the immediate cause of Private Shearer's death and, consequently, the basis of respondent's claim.

Respondent cannot avoid the reach of § 2680(h) by framing her complaint in terms of negligent failure to prevent the assault and battery. Section 2680(h) does not merely bar claims *for* assault or battery; in sweeping language it excludes any claim *arising out of* assault or battery. We read this provision to cover claims like respondent's that sound in negligence but stem from a battery committed by a Government employee. Thus "the express words of the statute" bar respondent's claim against the Government. *United States v. Spelar,* 338 U.S. 217, 219 [70 S.Ct. 10, 11, 94 L.Ed. 3] (1949).

The legislative history of § 2680(h), although sparse, is entirely consistent with our interpretation. There is no indication that Congress distinguished between "negligent supervision" claims and *respondeat superior* claims, with only the latter excluded under the Act. Instead it appears that Congress believed that § 2680(h) would bar claims arising out of a certain type of factual situation—deliberate attacks by Government employees. *United States v. Shearer,* — U.S. at —, 105 S.Ct. at 3042.

The fact situation presented in these cases is a deliberate sexual attack—an assault and a battery—which is excluded un-

4. *Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950).

der the Act. Plaintiffs allege negligent supervision. Despite this "semantical recasting of events," the assault and battery were the immediate causes of plaintiffs' injuries. To attempt to convert the conduct here from an intentional tort to negligent medical supervision would be an act of legal sorcery.

■ Plaintiffs also attempt to avoid the bar erected by 28 U.S.C. § 2680(h) by arguing that there was no assault or battery because they consented to the corpsman's actions believing them to be part of their normal medical treatment. *See Andrews v. United States,* 732 F.2d 366 (4th Cir.1984). The facts, however, as disclosed by the trial testimony and affidavits, do not support this conclusion. Neither girl consented to Rodriguez's lewd acts. Both, exercising their good judgment, resisted his efforts as best they could. In addition, *Andrews v. United States* is inapposite here.

In *Andrews* there was a 5-month relationship between Warrant Officer Gee and Mrs. Andrews. Gee had a Bachelor of Medical Science Degree from the University of Nebraska. He was a Physicians Assistant "able to perform those medical duties usually performed by physicians, including the prescription of a drug such as Elavil. . . ." 548 F.Supp. 603 at 606.

In confiding with a friend about her confused dependency on him, Mrs. Andrews referred to him as "Dr." Gee. 732 F.2d at 369, n. 3. After numerous counselling sessions with her and after treating her with the anti-depressant drug Elavil, "he engaged in sexual intercourse with her in his office at the clinic on her last visit there." 548 F.Supp. at 608. Then she went to Florida. Shortly thereafter, she returned to see him—they went from the "main hospital" to a Charleston motel where they "had sexual intercourse." 732 F.2d at 369, n. 4.

In short, in the guise of therapy, he induced her to believe that having sex with him was the best course of treatment for her depression. Therefore, the Fourth Circuit found that there was no assault or battery.

We have accepted the district court's finding that Mrs. Andrews consented to engage in sex with Gee because she was induced to believe that it was the best course of treatment for her. Hence, the Andrews claim did not arise out of an assault or battery.

*Andrews,* 732 F.2d at 371.

Thus, Mrs. Andrews' claim was not barred by the assault/battery exception because Gee obtained her consent over a 5 month relationship. In this case, both girls resisted the advances of a corpsman who entered their room for a few minutes, returned the next night, and then was gone forever.

Accordingly, this court is without jurisdiction to entertain plaintiffs' claims.

2. *Scope of Employment*

■ Even if plaintiffs' claims were not barred by the assault/battery exception, they would be barred by the "scope of employment" requirement under 28 U.S.C. § 1346(b). A prerequisite to maintaining a suit under the Federal Tort Claims Act is that the Government's employee must be acting with the scope of his employment. *Andrews v. United States,* 732 F.2d 366 (4th Cir.1984). Under South Carolina law, an "act is within the scope of a servant's employment where reasonably necessary to accomplish the purpose of his employment and is in the furtherance of the master's business." *Lane v. Modern Music,* 244 S.C. 299, 136 S.E.2d 713 (1964).

Rodriguez was a hospital corpsman. His duties did not include assaults and batteries on children. He was not furthering his master's employment when he sexually assaulted Thigpen and Kramber. Instead, he was furthering his own self-interest. His conduct—forcing the girls to touch his groin area and fondling Kramber—was not part of their medical care.

Therefore, plaintiffs' claims are barred because his conduct was not within the scope of his employment.

Thus, it is

ORDERED, that defendant's motion to dismiss these actions be, and the same is hereby, granted.

AND IT IS SO ORDERED.