Mearl S. ELLIS, Administratrix of the Estate of Yolanda Ellis, Deceased, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 76–2134.

United States District Court, D. South Carolina, Charleston Division.

Dec. 27, 1978.

---

C. D. Hopkins, Jr., North Charleston, S. C., E. Graydon Shuford, Decatur, Ga., for plaintiff.

A. Elliott Barrow, Jr., Asst. U. S. Atty., Charleston, S. C., for defendant.

## ORDER

SIMONS, District Judge.

This is a medical malpractice action brought by the plaintiff under the Federal Tort Claims Act and pursuant to Section

15–51–10 of the South Carolina Code (formerly Section 10–1951 of the 1962 South Carolina Code.) It is alleged, *inter alia*, that one John M. Ellis husband of Mearl S. Ellis and father of Yolanda Ellis, was admitted to the Veterans Administration Hospital in Charleston, South Carolina, on January 14, 1976, as a psychiatric patient, and that on January 18, 1976, he was permitted to leave the VA Hospital in the custody of his mother. It is further alleged that exactly five weeks later on February 22, 1976, John M. Ellis killed his daughter, Yolanda Ellis, by hurling her from a second story porch to the ground below. Plaintiff charges the United States, through the Veterans Administration Hospital, with malpractice in permitting the said John M. Ellis to leave the Veterans Administration Hospital while he was in a dangerous state of mind; it is further charged that the personnel at the VA Hospital negligently failed to warn Mearl S. Ellis, the patient's wife, of the dangerous propensities exhibited by John M. Ellis.

This case came on for trial on July 21, 1978, and after having heard and considered all of the evidence as submitted by both parties hereto, together with the written Briefs of the parties submitted to the court subsequent to the trial, the court makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. On January 14, 1976, John M. Ellis, a thirty year old male, was brought to the Veterans Administration Hospital in Charleston, South Carolina, by a friend and by the County Police; Mr. Ellis was in a very agitated, hostile frame of mind, made little sense when he tried to express himself verbally, and was handcuffed at the time of admission to the hospital. Mearl S. Ellis, the wife of John M. Ellis, was present and gave a history for Mr. Ellis of decreased sleep and decreased appetite for the patient of approximately two weeks' duration, as well as a history of heavy marijuana smoking for at least one year. Mrs. Ellis further indicated to the admitting physician at the Veterans Hospital, Patricia A. Nolte, M. D., that her husband's mother had been arrested, convicted, and sentenced to the Central Correctional Institution in Columbia, South Carolina, for a drug related offense approximately three (3) years earlier. Mrs. Ellis also stated that Mr. Ellis had not been hospitalized for mental illness prior to this occasion. Mrs. Ellis felt that her husband's present condition was due to his smoking too much marijuana and the fact that he had been drinking wine that day. Dr. Nolte entered into the hospital chart a summary of the foregoing information provided by Mrs. Ellis. She also noted that Mr. Ellis worked part-time at the Love Inn Pizza Parlor and that he was a part-time teacher.

2. At the time of admission, a definitive diagnosis of Mr. Ellis' problem was not made, but it was observed and noted that he was agitated with loose associations and rapid speech. Because a definite diagnosis could not be made immediately, Dr. Nolte concluded that several possible causes for the patient's condition should be considered, including drug intoxication, schizophrenia, or manic depression. A registered nurse made an entry into the chart on the date of Mr. Ellis' admission that the patient was delusional and dangerous to himself and perhaps to others. This nurse testified at trial that she had been on the psychiatric service for four and one-half months at this time, and that on the day in question Ellis had lunged at her and he was uttering obscenities at the time. Further, she stated that the notation that Ellis was dangerous was merely her initial nursing assessment of the patient. Mr. Ellis was placed in seclusion after admission. Though Mr. Ellis was placed in seclusion and was given an intramuscular injection of Thorazine, a mild tranquilizer, the psychiatrist, Dr. Nolte, testified that based upon her training and experience in the field, she was of the opinion that Ellis was not dangerous to himself or others. The dose of Thorazine given to the patient by injection was twenty-five milligrams, which is approximately equivalent to 100 milligrams of Thorazine given by mouth. The day after his admission Mr. Ellis' condition had changed and he was

allowed out of the seclusion room and into the day room.

3. On the date of admission, January 14, 1976, Dr. Nolte leaned toward a diagnosis of a psychotic drug reaction because of the history of heavy marijuana use. She testified that one who is psychotic perceives reality incorrectly, i. e., he has false ideas, is delusional, and may hallucinate; that psychotic symptoms are not necessarily precursors of homicidal or suicidal behavior, and are not indicative that one is or will become homicidal or suicidal. She also stated that "psychotic" does not mean violent, and one who is psychotic may or may not be violent. This initial diagnosis of the etiology of the patient's condition was corroborated by laboratory tests which showed solid medical evidence of chronic hepatitis, and was further corroborated by the fact that a relatively small dose of 25 milligrams of Thorazine completely sedated the patient shortly after admission.

4. The VA Hospital maintained the hospital chart in a special fashion called the "problem oriented record". This technique involves listing the problems that the patient presents on admission in numerical order, and whenever a progress note or physician's order is written in the chart, the problem to which that note addresses itself is listed in the progress note or physician's order. The observations made by the attending personnel of the condition of the patient are made in an orderly fashion as well, following the "soap" technique; the structure of the observations is *s*ubjective, *o*bjective, *a*ssessment, and *p*lan of action. The first letters of each word spell out the word "soap", and this approach adds uniformity to the method of record keeping. Thus, by way of example, a statement on January 16, 1976, relating to the problem of agitation and loose association does not necessarily mean that Mr. Ellis was agitated with loose association on that date, but this is simply a restatement of the problem to which the observation or treatment is directed on that particular day.

5. On January 16, 1976, Mr. Ellis was agitated, loud, exhibiting accelerated speech, but by January 17, 1976, the dosage of Thorazine had been reduced, indicating that Mr. Ellis' condition had improved; he was less agitated and was more easily controlled.

6. On January 18, 1976, Mr. Ellis indicated to registered nurse Cabading a very strong desire to leave the hospital and stated that his mother, who was on an unescorted weekend pass from the Central Correctional Institution, was coming to take him out of the hospital to conduct some very urgent personal business. He had indicated a similar desire to leave on January 16, but was persuaded not to do so by Dr. Miriam DeAntonio, who took over the care of the patient in the absence of Dr. Nolte. Shortly thereafter, at approximately 11:00 a. m., on the 18th, Mr. Ellis' mother appeared at the hospital and demanded that her son be released to conduct some urgent business outside of the hospital which would only take a few hours. January 18, 1976, was a Sunday, and neither Dr. Nolte nor Dr. DeAntonio was on duty. John M. Abess, M. D., a psychiatrist, was "on call" at that time, so Nurse Cabading read large portions of the chart to Dr. Abess over the phone, but inadvertently omitted the portion which stated that Ellis' mother was serving a prison sentence for a drug related offense. Dr. Abess also spoke with Ellis' mother over the telephone and gained the clear impression Ellis' departure from the hospital was imminent, and that he, Dr. Abess, would not have time to get to the hospital to examine the patient before Ellis left the facility. Dr. Abess testified that he was confronted with only two choices, i. e., allow Ellis to leave against medical advice (A.M.A.) or attempt to increase the probability of his return to the hospital by permitting the custody pass. Based upon Mr. Ellis' somewhat improved condition, and based upon the assurance given by his mother that she would return him to the hospital within a few hours, and further based upon the reasonable belief that Mr. Ellis would leave the hospital in any event, Dr. Abess advised Nurse Cabading to grant the custody pass. The custody pass provided that the patient was being released to the custody of his

mother who agreed in writing to return Mr. Ellis to the Hospital no later than 3:30 p. m. or 4:00 p. m. that afternoon. With this understanding, Mr. Ellis was permitted to depart the hospital on January 18, 1976, in the custody and control of his mother. Mr. Ellis was specifically diagnosed as not being suicidal or homicidal, though the Veterans Hospital staff did feel that Ellis needed further treatment for his agitated condition. Because Mr. Ellis was not thought to be suicidal or homicidal, the Veterans Hospital Staff was without authority to physically prevent Mr. Ellis from leaving the hospital.

7. The custody pass or trial visit away from the hospital, also known as the "open door" policy, is a recognized therapeutic device used by psychiatrists in the care and treatment of patients to ascertain if there is going to be any reasonable probability that the patient will ever be able to mix peacefully and appropriately with his family and society. The granting of a custody pass or a trial visit requires the exercise of the medical judgment by the psychiatric staff based upon all of the information available, and involves the balancing of the interests between this advantageous therapeutic device for the patient and the interest of society in peace and order.

8. John M. Ellis failed to return to the Veterans Hospital at any time after having been granted the custody pass on January 18, 1976. If he had returned, he would not have been required to go through the admission procedure, but simply could have walked onto the hospital ward and into his room, whereupon a notation would have been made in the chart as to the time of his return to the hospital. The hospital psychiatric staff intended to treat Mr. Ellis in the hospital for a total period of two or three weeks after which time he would have been discharged in any event.

9. Testimony reveals that on January 18, 1976, Mr. Ellis went to his home and stayed with his wife approximately two hours before departing with a friend, one John German (this is the same individual who accompanied Mr. Ellis to the hospital upon his admission on January 14, 1976). Mr. German was not called as a witness by either party. On Monday, January 19, 1976, Dr. Nolte returned to the Veterans Hospital and discovered that John Ellis had not returned pursuant to the custody pass granted the previous day. She then telephoned Mearl S. Ellis, the patient's wife, and advised her that Mr. Ellis was still in need of further hospitalization, and requested that Mrs. Ellis take steps to return him to the hospital. Mrs. Ellis seemed surprised that Mr. Ellis was not back in the hospital, as she knew that he was supposed to have returned on the afternoon of January 18, 1976. Mrs. Ellis did not and does not know where her husband spent the evening of January 18; and on the morning of January 19, she was unable to advise Dr. Nolte as to where Mr. Ellis could be found. Dr. Nolte told Mrs. Ellis that Mr. Ellis could readily return to the hospital and would not have to proceed through the customary admission process, but could simply appear on the hospital ward and resume treatment. Because Mrs. Ellis was aware of the symptoms Mr. Ellis had been exhibiting prior to his admission such as sleeplessness, agitation, decreased appetite, and loose associations, Dr. Nolte did not reiterate these observations, but she did tell Mrs. Ellis that Mr. Ellis was still sick and that he needed further hospitalization. Mrs. Ellis agreed to try to bring Mr. Ellis back to the hospital, though she, at that time, did not know where he was; she gave Dr. Nolte the telephone number of Ethel Ellis, Mr. Ellis' sister, as she thought that Mr. Ellis might be found there. Later on January 19, 1976, Mr. Ellis returned to his home where he remained until February 22, 1976, the date of the tragedy, and Mrs. Ellis did not get him to return to the VA Hospital. During the period of time between January 19, and February 22, Mr. Ellis continued to exhibit loose associations, rapid speech and incoherence, but at no time did Mrs. Ellis call the police or otherwise seek professional assistance to have Mr. Ellis readmitted to the hospital or committed to the State Hospital in Columbia, South Carolina, or take any other action.

10. Dr. Nolte telephoned Ethel Ellis on January 19, seeking further to ascertain where Mr. Ellis was and whether he was going to come back to the hospital. Ethel Ellis did not know where John M. Ellis was; she agreed to attempt to persuade John Ellis to come back to the hospital. Dr. Nolte held Mr. Ellis' bed at the Veterans Hospital open for him should he return until January 26, 1976, at which time for record keeping purposes, Mr. Ellis was discharged against medical advice, and there was no further contact with him.

11. John M. Ellis had no history of suicidal or homicidal behavior prior to his hospitalization at the VA Hospital in January 1976, and he exhibited no suicidal or homicidal behavior during his hospitalization. He exhibited no behavior indicative of suicidal or homicidal tendencies, and he never verbalized any suicidal or homicidal thoughts or threats. The evidence supports the court's finding that excessive drug use can trigger a reaction such as that exhibited by John M. Ellis on admission to the VA Hospital. Drug use also causes hepatitis and decreased liver function.

12. There is no way presently known to the medical art of psychiatry to predict with any degree of medical probability that a given individual will become psychotic. This holds true even though a given patient may be diagnosed as psychotic secondary to drug use where the patient subsequently used drugs; the use of drugs may or may not trigger a psychotic reaction, and if a psychotic reaction is triggered, the psychotic reaction may or may not be violent.

13. The medical judgment of the physician in this case to grant a custody pass was properly based upon all the medical evidence furnished by the medical record and history, the patient, his family, and the patient's status as a voluntary patient. The medical judgment to grant the custody pass properly considered that the release itself involved the placement of Mr. Ellis into the custody of a family member for a limited period of time only; it involved a sincere attempt to persuade Mr. Ellis to remain in the hospital for further treatment, and it involved an attempt to solicit the mother's assistance for that purpose. Upon realizing that Mr. Ellis had not returned as planned, Dr. Nolte advised the patient's wife and sister of his failure to return and sought their assistance in bringing him back to the hospital.

■ It is constitutionally impermissible for a state, through the civil commitment process, to confine a non-dangerous individual, who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends. *O'Connor v. Donaldson*, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975). Thus, in the instant case, because the people in the best position to know about the condition of Mr. Ellis, i. e., the physicians, determined that he, at that time, was not dangerous to himself or to others, it would have been constitutionally impermissible to have physically restrained Mr. Ellis to keep him in the Veterans Administration Hospital against his will, or to have him committed to the State Hospital in Columbia, South Carolina.

■ To support a finding of danger to himself or to others, there must have been clear and convincing medical evidence demonstrating and supporting such a finding. In this case the testimony at the trial, as well as the medical record prepared while Mr. Ellis was an inpatient at the VA Hospital, contained ample medical evidence that Mr. Ellis was not a danger to himself or to others at the time he was granted the custody pass. The record further establishes that he was not a danger to himself or to others for a period of almost five weeks after he left the VA Hospital. This court is without the legal right or the medical acumen to second guess the psychiatric staff of the Veterans Hospital. Additionally, the expert testimony offered by plaintiff in the form of depositions of certain doctors from the State Hospital in Columbia who treated Ellis after the tragedy which gave rise to this suit is not convincing to this court. These same doctors, upon being asked various hypothetical questions by government counsel, each stated that it was not a viola-

tion of generally accepted practices for the Veterans Administration Hospital to have granted a custody pass to Mr. Ellis as was done on January 18, 1976.

The government produced as an independent expert medical witness, Wayne H. Braverman, M. D., a practicing psychiatrist in Charleston, South Carolina. Dr. Braverman had examined the medical chart from the Veterans Hospital very carefully and had been apprised of the nature of Ellis' discharge as well as the events surrounding the tragedy on February 22, 1976, and of the treatment Ellis received at the State Hospital following the tragedy. Dr. Braverman testified that the psychiatric diagnosis made at the State Hospital in February 1976 was not medically relevant to the diagnosis made at the Veterans Hospital in January 1976. Dr. Braverman testified further that to support a diagnosis of homicidal, suicidal, or dangerousness, a patient must have a history of such behavior, must have made direct threats of physical violence, must have made verbal statements of homicide, suicide, or physical harm to himself or to others, or must have actually committed violent acts of a homicidal, suicidal or injurious nature. As of January 18, 1976, John M. Ellis had exhibited none of these symptoms, and therefore Dr. Braverman opined that the diagnosis made at the Veterans Hospital that he was not homicidal, suicidal or dangerous to himself or others was in compliance with recognized standards of accepted psychiatric practices and procedures. Finally, in answer to a detailed hypothetical question setting out all of the relevant facts in evidence in the case, Dr. Braverman testified that the granting of the custody pass to John Ellis on January 18, 1976, was clearly in compliance with generally accepted psychiatric standards, practices and procedures that are routinely and customarily practiced and followed by competent psychiatrists.

14. It was the opinion of the treating psychiatrists that, had he not left, John M. Ellis would have been requested to remain in the Veterans Administration Hospital for a total period of not more than three weeks from the date of his admission on January 14, 1976. It was also the opinion of the treating psychiatrists that most probably had the custody pass been denied, Mr. Ellis would have left the Veterans Administration Hospital before his treatment was completed in any event. The court adopts this opinion as a finding of fact. It was the further opinion of the treating psychiatrists that even had Mr. Ellis remained in the hospital for the entire two or three week period desired, nevertheless, such further treatment at the Veterans Administration Hospital most probably would not have prevented the fatal incident that occurred on February 22, 1976. The court adopts this expert medical opinion as a finding of fact. The symptoms of psychosis may appear or subside very rapidly in a patient with very little, if any, advance notice or apparent provocation.

15. The departure of John M. Ellis from the Veterans Administration Hospital on January 18, 1976, was in no way related to or a proximate cause of the fatal incident that occurred on February 22, 1976, when John M. Ellis hurled his daughter, Yolanda Ellis, from a second story porch to the ground below, thereby inflicting fatal injuries upon her.

Based upon the Findings of Fact stated above, the court makes the following conclusions of law:

## CONCLUSIONS OF LAW

1. This court has jurisdiction of the subject matter and jurisdiction of the parties of this action.

2. The burden of proof of negligence, proximate cause, and injury in a medical malpractice case is on the plaintiff throughout. In order to establish liability in a medical malpractice case, plaintiff must prove by a preponderance of the evidence the following:

(a) What the recognized and generally accepted standards, practices and procedures are in the community which would be exercised by competent physicians in the same specialty under similar circumstances.

(b) The physician or physicians and/or hospital personnel in question negligently deviated from the generally accepted standards, practices, and procedures.

(c) Such negligent deviation from the generally accepted standards, practices, and procedures was a proximate cause of the plaintiff's injury.

(d) The plaintiff was injured. *Steeves v. United States,* 294 F.Supp. 446 (D.S.C.1968); *Price v. Neyland,* 115 U.S.App.D.C. 355, 320 F.2d 674 (D.C. Cir. 1963).

3. A physician is bound to use reasonable care in the treatment of his patient and the rendering of professional services, but he is only bound to possess and exercise that degree of skill and learning which is ordinarily possessed and exercised by members of his profession who are in good standing and live in the general community. *Steeves v. United States,* 294 F.Supp. 446 (D.S.C.1968).

4. An incorrect diagnosis will not of itself support a verdict in a medical malpractice case, i. e., in order for liability to attach for an error in medical judgment, the physicians must have deviated from the generally accepted and recognized standards, practices, and procedures which would have been exercised by competent physicians under the same or similar circumstances in the community. *Steeves, supra. Walstad v. University of Minnesota Hospitals,* 442 F.2d 634 (8th Cir. 1971).

5. There can be no finding of a deviation from the generally accepted standards, practices, and procedures in a medical malpractice action in the absence of expert testimony to support it unless the subject matter of the action lies within the ambit of common experience so that no special learning is needed to evaluate the physician's conduct. *Burke v. Pearson,* 259 S.C. 288, 191 S.E.2d 721 (1972). Because of the elusive qualities of mental disorders and the difficulty of analyzing and evaluating them, and because of the uncertainty of diagnoses in this field and the tentativeness of professional judgment, expert medical testimony is required to support plaintiff's

claim in this case. *Hicks v. United States,* 167 U.S.App.D.C. 169, 511 F.2d 407 (D.C. Cir. 1975).

6. To prove causation or proximate cause, plaintiff must introduce expert medical evidence which affords a reasonable basis for the court to conclude that it is more likely than not that the Government's conduct was a substantial factor in bringing about plaintiff's damages. Proof of a medical causal connection must be something more than consistent with the plaintiff's theory of how the claimed damages were caused. Proof of causation cannot rest on conjecture, and the mere possibility of such causation is not enough to sustain the plaintiff's burden of proof. Moreover, when the medical causal relation issue is not one within the common knowledge of laymen, proximate cause cannot be determined without expert medical testimony, *Walstad, supra.*

7. The Veterans Administration Hospital in Charleston, South Carolina, practices the "open door" policy "whereby selected mental patients, those who do not indicate a tendency or inclination to do physical harm to themselves or to others, are permitted trial visits to their homes and families. . . . [S]uch visits 'constitute excellent therapy which is necessary if there is any reasonable possibility that the patient will ever be able to mix with society and become a useful citizen. Such a therapy program entails risks to the patient and to society as a whole, but it involves a balancing of interests which is most important in the psychiatric field.' " *Eanes v. United States,* 407 F.2d 823, 824 (4th Cir. 1969). This court is guided by the following statements from the District Court opinion in *Eanes* at 280 F.Supp. 151 (E.D.Va.1968):

"Calculated risks of necessity must be taken if the modern and enlightened treatment of the mentally ill is to be pursued intelligently and rationally. Neither the hospital nor the doctor are insurers of the patient's health and safety. They can only be required to use that degree of knowledge, skill, care and at-

tention exercised by others in like circumstances."

*Eanes* involved a voluntary patient in a Veterans Administration Hospital who was temporarily released for a 15-day trial visit at home. The patient was at liberty to leave the hospital at any time, as was John M. Ellis in the case at bar. Under the provisions of Section 44–17–410, based on the record before the court, Mr. Ellis could not have been involuntarily committed to a State hospital or a private hospital having a psychiatric facility. To invoke these commitment procedures, there must be a finding by at least one licensed physician to the effect that the patient is mentally ill and is likely to cause serious harm if not immediately hospitalized. The VA Hospital psychiatric staff concluded that Ellis was not suicidal or homicidal, or dangerous to himself or others at the time the custody pass was issued. The attending physician is in the best position to exercise his judgment regarding the patient's condition, *White v. United States*, 244 F.Supp. 127 (E.D.Va. 1965), *affirmed* 359 F.2d 989 (4th Cir. 1966), and the court should not second guess what a physician reasonably determined, based upon later events.

The fundamental issue before the court here is whether the medical judgment of the physicians at the Veterans Administration Hospital to grant John M. Ellis a custody pass was exercised in such a fashion as to be a negligent deviation from generally accepted psychiatric standards, practices, and procedures that are generally and customarily followed and practiced by competent psychiatrists in these circumstances in this community. This court concludes that the medical judgment exercised by the Government physicians in this case to grant the custody pass under the existing circumstances was in compliance with the generally accepted medical and psychiatric standards, practices, and procedures in the community, as expressed by the experts.

The testimony of Dr. Nolte was that psychotic symptoms would not enable one to predict dangerous, homicidal, or suicidal behavior. Furthermore, one who is psychotic is not necessarily violent as one may or may not be violent while experiencing a psychotic episode. Dr. Nolte's conclusions are supported by the absence of a history of prior hospitalization for mental illness and the history of heavy marijuana smoking in the past as indicated by the impaired liver function. Dr. Nolte's opinions are also supported by the improvement of the patient's condition during the period of hospitalization as evidenced by the reduction in the already small doses of Thorazine. Dr. Nolte also made note that Mr. Ellis exhibited no behavior indicative of suicidal or homicidal tendencies, and that he never verbalized any suicidal or homicidal ideation, though he was perceiving reality incorrectly.

This court recognizes as a matter of law that mental disorders are elusive and difficult to analyze and evaluate. Modern psychiatric medicine could not predict with any degree of medical probability that even if Ellis used drugs in the future, he would have a psychotic episode; furthermore, even if that could be predicted within any degree of medical probability, modern psychiatric medicine would be unable to predict within any degree of medical probability that such a psychotic episode would be violent, dangerous to the patient or to others, or homicidal or suicidal.

The staff at the VA Hospital in Charleston intended to keep Mr. Ellis in the facility for treatment for a maximum period of three weeks from January 14, 1976, that is, until no later than February 4, 1976. Thus, Mr. Ellis would have been out of the hospital on February 22, 1976, in any event. Further, the expert opinions in the record also prompt the court to conclude that even if Ellis had remained in the VA Hospital for the full three week period, the tragedy of February 22, 1976, most probably would not have been averted.

8. This court concludes that what was done at the Veterans Administration Hospital concerning John M. Ellis was in compliance with the generally accepted medical and psychiatric standards, practices, and procedures that are routinely and customarily followed and practiced by competent

psychiatrists in this community or locality at that particular time in similar circumstances. Accordingly, this court finds that the United States of America is not liable to the plaintiff for damages for the death of Yolanda Ellis. It is therefore

ORDERED that this cause be and is hereby dismissed with prejudice, each party to bear its own costs. It is further

ORDERED that judgment shall be entered for the defendant.

AND IT IS SO ORDERED.