**Anne C. McGRADY, Executrix of the Estate of Marion McGrady, Plaintiff,**

v.

**The UNITED STATES of America, Defendant.**

**Civ. A. No. 83–0501–0.**

United States District Court,
D. South Carolina,
Columbia Division.

Oct. 21, 1986.

**380**

William Reynolds Williams, Willcox, Hardee, McLeod, Buyck, and Baker, Florence, S.C., for plaintiff.

Wistar Stuckey, Asst. U.S. Atty., Columbia, S.C., for defendant.

## MEMORANDUM OF OPINION AND ORDER

WESLEY E. BROWN, Senior District Judge.

This is a medical malpractice action brought by plaintiff, Anne C. McGrady, as the Executrix of the Estate of Marion McGrady. She claims that the negligence of the medical personnel employed by defendant, the United States of America, at the Veterans Administration Hospital in Greenville, South Carolina was the proximate cause of her husband's tragic death. She seeks monetary damages from the United States pursuant to the Federal Tort Claims Act, 28 U.S.C. Secs. 2671 *et seq.*

On June 8, 1981, two grisly homicides occurred in Greenville, South Carolina. Col. Marion McGrady (ret.) was one of the victims slain by Aubrey Grizzle, who had been lying in wait for almost five hours inside a parking structure adjacent to the office building where Col. McGrady worked. Col. McGrady was a distinguished officer and citizen of the United States and a respected and loved husband and father.

The State tried Grizzle for these killings. A State court rejected Grizzle's plea of insanity defense. Grizzle was convicted by a jury of both murders and is incarcerated in a penal facility in South Carolina, serving two life sentences. Counsel advised this Court during the trial of this civil matter that the convictions were affirmed on appeal.

On the morning of June 8, 1981, Grizzle came to the Veterans Administration Hospital in Greenville without a prearranged appointment and was examined by the medical personnel of the psychiatric clinic. He was, however, a psychiatric outpatient of the South Carolina State Mental Health Center at Greenville for many years and was being routinely treated and counselled by psychiatrists from that State mental health facility. Plaintiff alleges that the medical personnel at the Veterans Administration Hospital ("VA") knew or should have known of Grizzle's schizophrenic mental condition and his propensity towards violence which would be a danger to himself and to others. Plaintiff contends that the VA medical personnel negligently failed to diagnose Grizzle as suffering from psychotic delusion and failing to alert McGrady of Grizzle's potential dangerous behavior. Plaintiff contends that the defendant's negligence is the proximate cause of the death of Col. McGrady.[1] Defendant denies any claim of liability by plaintiff, asserting that the attending physician, Dr. Joseph Nannarello, and the medical personnel of the psychiatric clinic of the VA were not negligent in the course of rendering any required medical services to Grizzle on the morning of June 8, 1981. Defendant contends that neither Dr. Nannarello nor the medical personnel failed to comply with a recognized standard of medical care which would be exercised by similar physicians and medical personnel under similar circumstances. Specifically, defendant contends that there was no factual basis upon which Dr. Nannarello could rely in invoking

---

1. Plaintiff in her original complaint also sued the South Carolina State Hospital and various medical doctors employed by the Greenville County Mental Health Facility. These parties were collectively referred to as "State Defendants." These State Defendants were dismissed from this action by orders of the Court filed January 15, 1985 and September 20, 1985.

the South Carolina civil commitment statute to involuntarily confine Grizzle in an appropriate mental health facility. Nor was there any evidence of specific threats by Grizzle revealed in the course of the physician-patient consultation, which would give rise to a duty to warn Col. McGrady that Grizzle was potentially dangerous to him.

The factual background of this litigation is not in substantial dispute. The parties have stipulated to much of historical facts which were reported in the medical files of Aubrey Grizzle. There is no dispute that Grizzle was diagnosed as suffering from various physical maladies as well as a mental disorder clinically known as schizophrenia (undifferentiated type), and that he had been confined in state mental health wards by orders of the State Probate Court pursuant to the State civil commitment statute. There is also no dispute that the jury in the criminal trial of Grizzle found him guilty of murdering Col. McGrady and another person on June 8, 1981, after he had been examined by the medical staff and was counselled by Dr. Nannarello at the VA earlier on the same date. The fact that Grizzle killed two persons following his visit at the VA does not, *ipso facto*, lead to such a conclusion that the medical personnel or Dr. Nannarello was negligent in his clinical consultation and assessment of the stability of Grizzle's mental condition. Fortified by hindsight upon the tragic events that had already occurred, it seems easy for the plaintiff to find an expert witness who will provide an opinion that the killings would not have occurred had Dr. Nannarello sought a judicial determination to commit Grizzle involuntarily on the morning of June 8, 1981. But proof of negligence may not be established, with the aid of hindsight, by merely showing an undesirable or even an injurious result. *Res ipsa loquitur* is not recognized as a legal doctrine in tort actions in South Carolina. *McLain v. Carolina Power & Light Company,* 286 F.2d 816, 819 (4th Cir.1961) (applying South Carolina law). Despite many recent advances in medical knowledge and medical technologies, a physician is not an insurer of a cure nor is he a guarantor of the result of his prescriptive treatment.

A physician is required to demonstrate that degree of care, skill, and knowledge in the performance of his professional services ordinarily possessed and exercised by other physicians who practice in his field under similar circumstances. The mere fact that a plaintiff's expert witness is of the opinion that he would have chosen a different approach or method in the diagnosis or treatment of a patient is not dispositive of determining the liability issue in a medical malpractice suit. Indeed, the threshold inquiry in this case is whether or not Dr. Nannarello failed to use that degree of reasonable care and skill in reaching his clinical judgment on Grizzle's mental condition on June 8, 1981 so as to constitute a breach of the recognized medical standards ordinarily exercised by members of that professional specialty under similar circumstances. The Court has considered the testimony adduced at trial, the documentary evidence and factual stipulations introduced into the record, the briefs of the parties and the applicable law. This Opinion shall constitute the Court's findings of fact and conclusions of law, as required by Rule 52(a), F.R.Civ.P.

Grizzle was a large stature person. He stood over six feet tall and weighed more than 250 pounds. As a young man growing up in Greenville, South Carolina, he aspired to become a professional boxer. His ambition, however, was cut short by a crushing blow to his right cheek in a boxing match when he was 20 years old. He sustained from this injury various symptoms of psychosomatic disorders which Grizzle frequently complained of having recurring acute headaches, sinus problems, impaired visual acuity and partial hearing loss. For a brief period in 1957, Grizzle enlisted for the military service. He was unable to adapt to the disciplined life of military duty. He complained of his physical maladies and argued with his superiors. The Army medical staff diagnosed that Grizzle had a schzoid personality and determined that his ailments were non-service

connected disabilities. After spending two months in the service, Grizzle was discharged by the Army in April 1957.

Grizzle returned to his hometown in Greenville. He had known Col. McGrady, and they were friends for many years. Col. McGrady was an Army officer who retired in 1961 with a distinguished record of service. Following his retirement from the military service, Col. McGrady was employed as the district manager for an electrical fixtures wholesale company in Greenville. The closeness of their relationship was such that Col. McGrady hired Grizzle to work for him in the business of selling electrical fixtures. Col. McGrady also tried unsuccessfully to persuade military officials to have Grizzle's medical conditions declared as service connected disabilities so that Grizzle could become eligible for VA medical benefits. Between February 1965 and August 1966, the medical records showed that Grizzle was hospitalized in a South Carolina state hospital and a VA hospital in Augusta, Georgia for treatment of physical and mental problems. Each admission for hospitalization did not last longer than one and one-half months.

In January 1969, United States Secret Service agents came to Col. McGrady's house and asked for Grizzle's whereabouts. Apparently Grizzle had made some threatening statements against the life of President Richard Nixon. Col. McGrady agreed to help the Secret Service agents find Grizzle. The federal officers found Grizzle and proceeded to arrest him. Grizzle resisted by pulling a gun on them. The federal officers shot Grizzle in the leg. The record shows that Grizzle was charged in a complaint with making an oral threat to take the life of the President of the United States. A judge of this District Court ordered Grizzle be examined by the psychiatric institution at Springfield, Missouri. Although he was found competent to stand trial, the medical staff recommended his commitment to a mental health facility "until he ceases to have delusional ideas concerning his Army experience." The federal charge was dismissed on May 5, 1969, after Grizzle was committed to the State Hospi-

tal in Columbia, South Carolina by order of a State judge. During the next six years, Grizzle was detained at that State Hospital as an involuntary psychiatric patient. His federal habeas corpus petition in 1975 challenging the legality of his indeterminative confinement was dismissed upon the finding by the District Court that his detention was appropriate under the State statute. Less than six months following the dismissal of his habeas corpus petition, the State Hospital released Grizzle on November 17, 1975 from its custody and referred him to the care and treatment as a psychiatric outpatient at the Greenville County Mental Health Center. Both parties have agreed that Grizzle held a grudge against Col. McGrady since the date of his arrest by the federal officers in 1969. Grizzle believed that he was betrayed by Col. McGrady who assisted the federal officers to arrest him. Meanwhile, Col. McGrady had assumed the position as the Civil Defense Director of Greenville County in 1971.

Anne McGrady thought that there were probably some occasional contacts between Col. McGrady and Grizzle since his release from the State Hospital in 1975. Their social relationship remained uneventfully serene until June 6, 1979. On that date, Grizzle assaulted Col. McGrady in the Coffee Street Mall in Greenville, knocking him unconscious. A news article by the local newspaper reported that the assault was unprovoked. A copy of this news account was placed in Grizzle's medical files by an administrative staff at the VA in Greenville. When Col. McGrady refused to proceed with the criminal prosecution of Grizzle, the State sought to commit Grizzle involuntarily in a probate court proceeding. Upon filing of a petition for civil commitment, Grizzle was remanded to the custody of the State mental health facility on June 29, 1979 for psychiatric examinations. The state staff psychiatrists concurred in their assessment that Grizzle, who was diagnosed of having a long history of mental illness, was in a relapse in his chronic undifferentiated type of schizophrenia. They found that the reasoning faculty of Grizzle

was impaired by his paranoid delusional ideas of persecution—a clinical phenomenon indicating that the mental condition of Grizzle was in a decompensation phase—as the change of his mental stability was apparently attributable to his failure to adhere to the prescribed psychotherapeutic treatments at the Greenville County Mental Health Center. In a commitment hearing held on October 4, 1979, a State Probate Court found and adjudged that Grizzle was mentally ill and ordered him to be committed to the care and treatment of an appropriate State mental health facility.

During the period of his confinement in the State Mental Health Hospital, Grizzle's medical files show that there was a complaint to the hospital administrator by Col. McGrady of Grizzle making harassing telephone calls to his family. At the direction of a staff psychiatrist, the hospital staff temporarily suspended Grizzle's telephone privilege. The medical files do not show that Grizzle resumed pestering the McGrady family when the restriction on his telephone use was lifted. His medical files, however, show that there was a gradual improvement in his prognosis. He was responding well to treatments of medication and counselling. He was making such a steady progress that the medical staff granted him a two-week leave during Christmas to stay with his mother. Less than six months of treatment at the detention of the State Mental Health Hospital, the staff psychiatrist found that Grizzle was mentally competent and capable of controlling his schzoid personality by taking various dosages of therapeutic drugs. In the discharge report of January 28, 1980, the state treating psychiatrist decided to release Grizzle from the custody of the State Hospital, noting in his final diagnosis of Grizzle's mental condition as "(s)chziophrenia, undifferentiated type, not psychotic now." Grizzle was required to take a prescription consisting of Trilafon, Benadryl, Vistaril, and Kemadrin—all of which were drugs for treating psychosomatic disorders—to visit regularly with psychiatrists at the Greenville County Mental Health Center.

Dr. Kenneth Waggett was the psychiatrist at the Greenville County Mental Health Center assigned to supervise the outpatient treatment program designed for Grizzle. Dr. Waggett saw Grizzle on a regular basis, usually once every four months. His treatment plan, consisting of a prescription for Trilafon, Benadryl, Dalmane, and Kemadrin, appeared to produce some efficacious clinical results. Although Dr. Waggett noted that Grizzle frequently complained of his somatic ailments, Dr. Waggett observed during each visit with Grizzle that Grizzle was in good contact with reality and well oriented in his thinking.

The record does not show that Grizzle was gainfully employed since his release from the State Mental Health Hospital in January 1980. He lived with his mother and derived most of his subsistence and financial support from her. It is not clear whether or not Grizzle was on any welfare relief program. He was, however, required to pay for the medicine prescribed by the psychiatrist at the Greenville County Mental Health Center. The bill for each prescription filled was approximately $15.00. Grizzle believed that his service in the Army would entitle him to receive some medical benefits, including free medicine, from the VA at Greenville. In each visit between March 1980 and June 8, 1981 at the VA, he complained of his headaches, facial and neck pains, and sinus problems and insisted in claiming these physical maladies were service connected disabilities. Attending physicians noted in their medical evaluations Grizzle's complaints for physical disorders as well as the psychiatric treatments that were given by Dr. Waggett at the Greenville County Mental Health Center. On November 20, 1980, Dr. Nannarello saw Grizzle for the first time since his discharge from the State Mental Health Hospital. In the Progress Notes, Dr. Nannarello's handwritten assessment that described Grizzle's mental and physical conditions is substantially reproduced as follows:

"Lives with his mother. This man is agitated, displays pressure of speech, disorganized thought process. He wants to be hospitalized saying he needs surgery for his nose because of bleeding & obstruction.

Thinking & behavior is psychotic. He is under the care of Dr. Waggett at MHC for this & claims to be better. I will call Dr. Waggett about his present mental state.

I explained that he is not S.C. for the medical treatment he is requesting. He does not understand these.

Mrs. (illegible) suggest med exam to determine if he requires hospitalized for med. reason. He will not accept psychiatric hospitalization & is not committable."

Dr. William McCuen, the Chief Medical Officer of the VA in Greenville, also saw Grizzle on the same date. His handwritten notes cryptically describing his examination of Grizzle revealed the following:

"Pt. (patient) former preprofessional boxer sustained injury to right zygoma & brain in course of fights. Now has pains & hyperalegesis & bleeding from nose. Please reevaluate these nose, sinus, etc. problems."

Dr. McCuen suggested in December 1980 to refer Grizzle to see an ENT (ear, nose and throat) specialist at the Duke University in Durham, North Carolina. Grizzle declined to have a follow-up visit at the Duke University at that time. Instead, he was seen by a specialist at the ENT Clinic in Greenville. Dr. Larking examined Grizzle on December 3, 1980. He noted there were injuries in Grizzle's right nasal septum and wrote a prescription for Grizzle. Four months later, Grizzle came back to the VA and repeated his complaints about headaches and vision problems. Dr. McCuen requested on April 20, 1981 that the administrative staff arranged an appointment for Grizzle to see an ENT specialist at the Duke University under the ambulatory care program. His appointment date at the Duke University was scheduled on June 5, 1981. The administrative staff at the Greenville VA hospital forwarded the entire medical files of Grizzle to the VA hospital in Durham some time during the third week of May 1981. Meanwhile, Grizzle continued receiving treatments under the care of Dr. Waggett. On April 29, 1981, Dr. Waggett visited with Grizzle in a routine appointment for consultation. Dr. Waggett observed that Grizzle appeared calmer and was not "showing the pressure of speech that he had" during the last visit. He noted that the VA had arranged for Grizzle to see a neurologist at the Duke University during the first week of June for an evaluation of his somatic problems. Dr. Waggett continued the course of treatment with the same medicine and scheduled an appointment to see Grizzle again in three months. This April 29th meeting, however, was the last time Dr. Waggett saw Grizzle as an outpatient at the Greenville County Mental Health Center. Grizzle shot and killed Col. McGrady and Sam Sneeden in the evening of June 8, 1981.

On the morning of June 8, 1981, Grizzle came to the VA at approximately 8:30 a.m. He was loud and very agitated. He requested the receptionist for an unscheduled visit with Dr. McCuen. Dr. McCuen was unable to see Grizzle at that time because he had another patient in his office. Dr. Nannarello's scheduled patient did not come in on that morning. He agreed to see Grizzle after Nurse Gollin completed the routine examination of Grizzle. She noted on the medical chart that Grizzle

"states he has a lot of pains in his head—coughing, his facial numbness at times. Was seen at ENT Clinic at Durham. States ENT Dr. was referring him to somebody else. Med: Dalmane, Trilafon, 8 mgm h.s.; Benadryl, 50 mgm h.s.; Thorazine, 50 mgm h.s.; Bentyl, 10 mgm (illegible, before meals); Kemadrin—am; Metamucil."

The attending nurse observed that Grizzle appeared in control of himself and was in touch with reality. He sat still throughout the routine examination and was responsive in answering each question by Nurse Gollin. His verbal complaints focused on

his physical problems and the medical personnel at the VA hospital in Durham. He did not mention to Nurse Gollin about his traffic citation or make any threat against the life of Col. McGrady or anyone else. Nurse Gollin led Grizzle to see Dr. Nannarello at approximately 9:10 a.m. She gave Dr. Nannarello the medical report which she had just prepared. This medical chart was the only clinical assessment report on Grizzle presented to Dr. Nannarello on that morning. The entire medical files on Grizzle were still in the custody of the hospital in Durham. These files were not returned to the VA in Greenville until June 9, after the killings had already occurred.

Dr. Nannarello remembered Grizzle as his former patient who was diagnosed of suffering from schizophrenia. Dr. Nannarello observed that Grizzle's demeanor was loud and insistent as he began to talk. He noticed that there were three subjects which Grizzle constantly repeated throughout their conversations—all of which concerned his angry feelings towards the VA personnel and the Army. He told Dr. Nannarello that he was upset because the ENT specialist at Durham did not treat him properly, he was stopped by a state trooper for speeding on his way to Durham, and the Army wrongly denied his service connected disability benefits for his illnesses.[2] Grizzle seemed to calm down after he ventilated his wrathful feelings. Dr. Nannarello observed that there was a selfish, manipulative and narcissistic personality coexisting with Grizzle's schziophrenic behavior. He found no empirical evidence of delusional, psychotic or hallucinative thinking displayed by Grizzle. Grizzle made no statements of threat against the life of Col. McGrady or anyone else during the entire one-hour consultation. Indeed, Grizzle's boisterous behavior demonstrated that his ego was intact. He was making demands for his own sake. Dr. Nannarello ex-

plained to Grizzle that it was not possible for the VA to reimburse him on the traffic ticket fines. He told Grizzle that he was unfamiliar with the VA regulations on determining the eligibility for service connected disability benefits. He suggested that Grizzle should discuss this subject with the Assistant Chief Administrator of the VA, Renee Day. Dr. Nannarello interpreted the statement made by Grizzle before he left Dr. Nannarello's office that "I'm going bad if don't get S.C. (service connected benefits)" as his last manipulative attempt to exact one of his demands. There was no display of violence by Grizzle when he made the statement. Indeed, Dr. Nannarello felt that Grizzle seemed willing to accept the reasons given for rejecting his demands and remained calm as he was escorted by Dr. Nannarello to confer with Renee Day on the matter of veteran disability benefits. Plaintiff offers a reason that Grizzle did not become overtly violent was because of the presence of two police officers in the main lobby. This opinion testimony is highly speculative. Even if this is a probable explanation for Grizzle's calmness, it would further strengthen the soundness of Dr. Nannarello's assessment that Grizzle was not undergoing decompensation as he was in touch with reality. Based upon his clinical experience, Dr. Nannarello believed that Grizzle was in control of himself and determined that there was no factual basis upon which Grizzle was required to be involuntarily committed under the criteria set forth in the State civil commitment statute.

Grizzle spent approximately 20 minutes with Renee Day in discussing about service connected disability entitlements. Day also explained that there was no basis for reimbursing his traffic ticket fines. Day felt that Grizzle calmly accepted the reasons given by her and left her office at approximately 10:30 a.m. Shortly thereafter, Day

---

**2.** Dr. Nannarello's notes, as far as this Court can decipher his penmanship, are reproduced as follows: "He spoke with pressure & excitement, moving from one subject to another. He is upset because the ENT doctor at Duke was abrupt with him. Organic brain syndrome. He

wants to get S.C. so he would not have to pay for medicine. He is going to MHC. Refuses VA Hosp. 'I'm going bad if don't get S.C.' He wants VA to pay traffic ticket he acquired on trip to Duke.

saw Grizzle return to the receptionist's desk. He told the receptionist that he had misplaced his patient data card. The receptionist told him that he would have to wait a few minutes until she had time to type up a replacement. Grizzle decided not to stay in the waiting area when the receptionist said that she would send his patient data card by mail. Grizzle left the VA premises before noon.

The record of the criminal trial evinced the events that transpired after Grizzle left the VA on the morning of June 8, 1981. He went to purchase some ammunition and then drove to the County Office Building where Col. McGrady was working at that time. He did not go into the building but waited in his car which he parked inside the parking structure adjacent to the County Office Building. He sat in his car from about 12:00 noon until 5:00 o'clock, waiting for Col. McGrady to come out of the County Office Building at the end of his work day. Shortly after 5:00 p.m., Col. McGrady left his office and walked toward the parking area. Before Col. McGrady reached his car, Grizzle came out from his car with a shot gun in his hand. He fired four shots at Col. McGrady, killing him. Grizzle then drove to a car dealership in Greenville, Chet Smith Pontiac, where he shot and killed Samuel Sneeden, the service manager, with a pistol. Grizzle was arrested and charged with two counts of murder. He was examined by court-appointed psychiatrists to determine his mental capacity to stand trial—one of whom, Dr. Alberto Gonzales Acevedo, testified in the criminal trial as well as in this civil trial. The State court rejected Grizzle's plea of insanity and mental incompetency. At the close of the evidence, the trial court instructed the jury to return one of three verdicts—guilty, not guilty, or not guilty by reason of insanity. The jury found Grizzle guilty of both murders, and the State court sentenced him to two life terms. It is noteworthy here in this civil negligent action to recognize the collateral effect of the jury's determination in the criminal trial because it represents a factual finding on the mental condition of Grizzle at the time he committed the acts of killing. By returning a guilty verdict on each count of murder charges, the jury conclusively found beyond a reasonable doubt that under the M'Nagten standard adopted by South Carolina Grizzle had sufficient mental capacity to know and understand the nature and quality of his acts and to distinguish between right and wrong at the time he committed the acts of homicide on June 8, 1981.

Plaintiff has not attempted to impeach the jury verdict that vindicated the law which was breached by the murder of her husband. Plaintiff, however, has tried to distinguish the M'Nagten standard as inapplicable to resolving the issues in this medical malpractice case. The thrust of her contentions is two-fold: that Dr. Nannarello was negligent in failing to diagnose Grizzle's dangerous propensity, and consequently, that Dr. Nannarello failed in his duty to take appropriate means to protect Col. McGrady or others against such propensity.

The Federal Tort Claims Act directs us to apply the law of the state where the act or omission occurred in order to determine whether or not a complaint sounding in tort of negligence warrants relief. 28 U.S.C. Sec. 2674.[3] *See United States v. Muniz*, 374 U.S. 150, 153, 83 S.Ct. 1850, 1852, 10 L.Ed.2d 805, 809 (1963). In this case, Dr. Nannarello, who performed clinical examinations on Grizzle on June 8, 1981, was an employee of the United States at the VA hospital in Greenville, South Carolina at that time, and the death of Col. Marion

**3.** 28 U.S.C. Sec. 2674 provides: "The United States shall be liable, respecting the provisions of this title relating to tort claims in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages. If, however, in any case wherein death was caused, the law of the place where the act or omission complained of occurred provides, or has been construed to provide, for damages only punitive in nature, the United States shall be liable for actual or compensatory damages, measured by the pecuniary injuries resulting from such death to the persons respectively, for whose benefit the action was brought, in lieu thereof."

McGrady occurred in Greenville, South Carolina. The applicable law is the law of South Carolina.

It is recognized as hornbook law that the traditional formula necessary for establishing a negligence cause of action is comprised of four essential elements of proof. They are:

(1) a duty recognized by law, requiring the actor to conform to a certain standard of conduct, for the protection of others against unreasonable risks; (2) a failure on the part of the actor to conform to the standard required; (3) the breach of the duty must be the 'proximate cause' of the injuries; and (4) actual loss or damage resulting to the interest of others.

Prosser, *Law of Torts* Sec. 30 (4th Ed. 1971); *Shipes v. Piggly Wiggly St. Andrews, Inc.,* 269 S.C. 479, 238 S.E.2d 167 (1977). In a medical malpractice action, the burden of proof of negligence, proximate cause, and injury rests on the plaintiff throughout the case. *Ellis v. United States,* 484 F.Supp. 4, 10 (D.S.C.1978). Liability exists only when a plaintiff proves by a preponderance of the evidence the following: (1) the existence of the recognized and generally accepted standards, practices and procedures which ordinarily would be exercised by competent physicians in the same specialty under similar circumstances, (2) the physician in qustion negligently deviated from the generally accepted standards, practices and procedures, (3) such negligent deviation from the generally accepted standards, practices and procedures was a proximate cause of the plaintiff's injury, and (4) the plaintiff was injured. *See Phillips v. United States,* 566 F.Supp. 1, 12 (D.S.C.1981). In determining the degree of care and skill which is ordinarily exercised by members of a medical profession, the "locality rule," as applied in *Ellis v. United States, supra,* is no longer considered as the dispositive standard in deciding the standard of care in medical malpractice cases. Rather, the Supreme Court of South Carolina in 1981 adopted "a standard of care not bound by any geographical restriction." *King v. Williams,* 276 S.C. 478, 279 S.E.2d 618, 620 (1981). In *King, supra,* the State Supreme Court announced the following standard:

"The 'locality rule' has no present-day vitality except that it may be considered as one of the elements to determine the degree of care and skill which is to be expected of the average practitioner of the class to which he belongs. The degree of care which must be observed is, of course, that of an average, competent practitioner acting in the same or similar circumstances. In other words, local practice within geographic proximity is one, but not the only factor to be considered. No longer is it proper to limit the definition of the standard of care which a medical doctor or dentist must meet solely to the practice or custom of a particular locality, a similar locality, or a geographic area."

279 S.E.2d at 620. "Because of the elusive qualities of mental disorders and the difficulty of analyzing and evaluating them," *Ellis v. United States, supra,* 484 F.Supp. at 11, the determination of whether or not a chosen course of diagnosis or treatment is appropriate in the practice of psychiatry is normally "outside the realm of ordinary lay knowledge." *Green v. Lilliewood,* 272 S.C. 186, 249 S.E.2d 910, 912 (1978). Expert testimony is generally necessary for determining the competency of a psychiatrist's diagnosis and the soundness of his professional judgment. *Ellis v. United States, supra,* at 11.

On the basis of Grizzle's medical records, all of the expert witnesses concurred in their testimony that Grizzle was afflicted with a mental disorder known in the field of psychiatry as chronic schziophrenia, undifferentiated type. Besides Dr. Nannarello, the only expert witness whose testimony was based upon his direct observations and detailed examinations of Grizzle was Dr. Acevedo. As noted earlier, Dr. Acevedo, a psychiatrist licensed to practice in South Carolina and Florida, was appointed by the State court to conduct an evaluation of Grizzle's mental condition for the purpose of providing a medical opinion as to his

competence to stand trial and his criminal responsibility according to the standard of the State criminal law. Dr. Acevedo saw Grizzle on the morning of June 9, 1981. He observed that while Grizzle showed signs of depression, he appeared alert and had good memory. His intelligence level was such that it demonstrated his thinking ability was concretely oriented, yet circumstantial in some aspects, to matters surrounding him. There was no display of such behavior which would indicate that he was undergoing decompensation. He was in substantial control of his physiological movements. Dr. Acevedo found no evidence of delusional, psychotic thinking or behavior exhibited by Grizzle on that morning. "The cardinal symptom of schizophrenia," says Dr. Acevedo, is a showing of "affective indifference" by such patient to his act or conduct. That type of behavior was not demonstrated by Grizzle on the morning following the murders. Rather, Grizzle was showing expressions of grief and remorse over the death of his friend. Dr. Acevedo learned from Grizzle in their conversations that Grizzle had taken some medication as he told Nurse Gollin on the previous morning. Dr. Acevedo continued ordering similar prescriptions for Grizzle throughout the two-week evaluation period.

Based upon his direct examination and assessment of Grizzle and his medical history, Dr. Acevedo held the opinion that Grizzle was not psychotic on the morning of June 9, 1981 and believes that it was "possible but unlikely" that Grizzle was psychotic on June 8, 1981. Dr. Acevedo, however, points out that there were factual circumstances which dispelled such a possible conclusion on Grizzle's mental condition so as to require Dr. Nannarello to precipitate involuntary commitment on the morning of June 8, 1981. Clinical studies have reported the phenomenon that a schziophrenic whose behavior becomes violently psychotic usually shows his thinking patterns are so disorganized as to render him unable to compose and implement a logical sequence of actions. Dr. Acevedo opines that it would be highly improbable to conclude that Grizzle was psychotic or delu-

sional on June 8, 1981 as he was able to wait five hours in hiding to carry out his plan for killing. Dr. Acevedo believes, and has held the same view in the criminal trial as well, that during this five-hour period Grizzle was premeditating and calculating the efficacy and the consequence of killing both Col. McGrady and Sam Sneeden, as Grizzle was fueled by his angers and grudges against those whom he thought had cheated or betrayed him. Dr. Acevedo is of the view that Dr. Nannarello had no factual basis to show that Grizzle was dangerous to himself or to others so as to require Dr. Nannarello to commit Grizzle involuntarily to a mental health institution on the morning of June 8, 1981.

Plaintiff introduced the expert witness testimony of Dr. Selwyn Rose. He has a medical degree and a law degree, and is licensed to practice psychiatry in California and North Carolina. Trained in the field of forensic psychiatry, Dr. Rose is a professional expert witness who has travelled around the country rendering his clinical opinions in medical malpractice cases. He acknowledges in this case that he had not seen or examined Grizzle in person. His opinion is based upon a reconstruction of Grizzle's mental state on June 8, 1981 by reviewing the historical facts reported in Grizzle's medical files. He is of the opinion that on the morning of June 8, 1981 Dr. Nannarello failed to exercise that degree of care and skill which a reasonably competent physician should have exercised under the same or similar circumstances. Dr. Rose thinks that Grizzle's mental stability on the morning of June 8, 1981 was in such a dangerous condition that proper clinical approaches would require more than using the method as chosen by Dr. Nannarello to calm down Grizzle. Specifically, Dr. Rose believes that a reasonably competent psychiatrist presented with the clinical situation similar to that faced by Dr. Nannarello would have taken a different course of treatment, either by giving Grizzle a stronger dosage of tranquilizer medication or by seeking a judicial determination to commit Grizzle involuntarily. He attempt-

ed to overcome the fact that Grizzle made no statement of threat identifying Col. McGrady as his intended victim. Dr. Rose contends that had Dr. Nannarello conducted his interview differently, Grizzle's psychotic thought against Col. McGrady would have been discovered from his statement concerning his demand for service connected disability benefits.

We find that Dr. Rose's opinion testimony offered in support of plaintiff's claim of negligence is too speculative. In asserting that Dr. Nannarello failed to exercise that degree of care and skill ordinarily exercised by members of his profession under similar circumstances, Dr. Rose relies heavily upon conjecture and hindsight to support his view. Throughout his testimony, Dr. Rose repeatedly emphasized that because Grizzle killed two persons following his visit with Dr. Nannarello, it would lead to a conclusion that Dr. Nannarello was negligent in failing to properly exercise his clinical judgment. *See* Rose, Vol. II at 181; Vol. III at 24, 37, 48. However, Dr. Rose agrees that after Dr. Nannarello spoke with Grizzle and calmed him down, there was no factual basis for an involuntary commitment. Rose, Vol. III at 48.

Even if Grizzle had made some threats, they are, by themselves, usually not enough to form a basis for portending the potential propensity for violence. As psychiatrists often confront in their practice, such threatening statements are commonly expressed by mental patients. They pose but do not answer the difficult and elusive question of whether or not a clear and present danger is actually present. While psychiatric predictions of dangerousness are not entirely reliable, psychiatrists are not soothsayers foretelling events in the art of clairvoyance. They are trained medical specialists who can make only an educated guess with some degree of scientific certainty upon the factual circumstances presented before them. In this case, the predictability of Grizzle's violent propensity was even more difficulty to fathom on the morning of June 8, 1981 when there had not been any violent episodes exhibited by Grizzle after his release form the State Mental Health Hospital since January 1980.

To invoke the procedures for civil commitment under Section 44–17–410, South Carolina Code of Law, "there must be a finding by at least one licensed physician to the effect that the patient is mentally ill and is likely to cause serious harm if not immediately hospitalized." *Ellis v. United States, supra,* 484 F.Supp. at 12. A finding that the mentally-illed patient is a danger to himself or to others must be supported by clear and convincing medical evidence showing such a dangerous condition is in existence. *Id.,* at 9. The United States offered the testimony of Dr. Thomas Messervy, a psychiatrist who is licensed to practice in South Carolina. He is also a member of the "Peer Review Board" sanctioned by the South Carolina Medical Association. The Board is charged with the function of reviewing professional standards on practices and procedures of practicing psychiatrists in South Carolina. He is familiar with the South Carolina statutes on mental health care and the recognized and generally accepted standards, practices and procedures that would ordinarily be exercised by competent psychiatrists in South Carolina. Upon a review of the entire medical files on Grizzle, Dr. Messervy was of the opinion that there was no clinical evidence which would necessitate an involuntary commitment of Grizzle on the morning of June 8, 1981. His testimony substantially corroborates that of Dr. Acevedo in a discussion on the significance of Grizzle's ability to wait a lengthy period before carrying out his plan for action. Dr. Messervy found no factual basis to conclude that Dr. Nannarello acted negligently or carelessly in attending the medical and psychiatric needs of Grizzle so as to constitute a failure to comply with the recognized and generally accepted standard of care and skill ordinarily exercised by members of his profession under the same or similar circumstances. The Court finds that Dr. Messervy's testimony is highly credible and his articulated and persuasive opinions are factually well-founded.

**390**

In view of the importance of actual clinical observations and examinations by Dr. Nannarello and Dr. Acevedo, and in view of the entire record in this case, the Court finds that Dr. Nannarello's clinical judgment upon a functional assessment of Grizzle's mental condition on June 8, 1981 was appropriate and competent under the generally recognized and accepted medical standard required of in his professional specialty. Dr. Nannarello owed no duty to plaintiff to control Grizzle's conducted, nor was he required to undertake any actions to protect Col. McGrady from any unforeseeable harm. The Court also finds that there was no negligence on the part of any medical personnel employed by the United States at the Veterans Administration Hospital in Greenville, South Carolina in the course of or relating to the medical diagnosis or treatment of Grizzle's mental or physical infirmities on June 8, 1981. Based upon the believable and competent evidence and testimony, the Court concludes that plaintiff has failed to sustain her burden of proof in this medical malpractice action against the United States for the wrongful death of her husband.

Accordingly,

IT IS BY THE COURT THEREFORE ORDERED that plaintiff is not entitled to the relief demanded by her in her complaint;

IT IS FURTHER ORDERED that the complaint of plaintiff should be and is hereby DISMISSED; and

IT IS FURTHER ORDERED that the Clerk shall enter Judgment forthwith in favor of defendant against plaintiff, Rule 58, F.R.Civ.P.

Each party shall bear its own costs.